# IN THE UNITED STATES DISTRICT COURT FOR THE

# WESTERN DISTRICT OF NORTH CAROLINA

# CHARLOTTE DIVISION

| | |
|---|---|
| JENNIFER HAMILTON, on behalf of ) <br> C.M.H.; SUSAN HUNTER, individually and ) <br> on behalf of E.R.H. and O.E.H.; ) <br> SAMANTHA HATCHELL, on behalf of ) <br> H.P.H.; SERETHA DAVIS-ROBINSON, on ) <br> behalf of S.A.D.; BRAUNTE MOWBRAY, ) <br> on behalf of K.A.H., and REESE ) <br> BLACKSHEAR, on behalf of Q.B. and E.B., ) <br> KETRA CHAMBERS, on behalf of A.C.; ) <br> ARINNE COLEMAN, on behalf of MAR.N. ) <br> and MAL.N., and JESSICA ) <br> GARRIS-WILSON, on behalf of J.W. and ) <br> J.G., ) <br>         Plaintiffs, ) <br> ) <br>       v. ) <br> ) <br> BONNIE CONE LEADERSHIP ) <br> ACADEMY, L.L.C. and CHARTER ONE, ) <br> L.L.C., ) <br>         Defendants. ) <br> ) | Civil Action No.: 3:24-cv-1104 <br><br><br><br><br><br><br><br> **COMPLAINT** <br><br> **(Jury Trial Demanded)** |

## COMPLAINT

**NOW COME** Plaintiffs Jennifer Hamilton, on behalf of C.M.H.; Susan Hunter,

individually and on behalf of E.R.H. and O.E.H.; Samantha Hatchell, on behalf of H.P.H.;

Seretha Davis-Robinson, on behalf of S.A.D.; Braunte Mowbray, on behalf of K.A.H., Reese

Blackshear, on behalf of Q.B. and E.B.; Ketra Chambers, on behalf of A.C.; Arinne Coleman, on

behalf of MAR.N. and MAL.N., and Jessica Garris-Wilson, on behalf of J.W. and J.G., by and

through their undersigned counsel complain of above-captioned Defendants as follows:

## PARTIES

**A.     Plaintiffs and their Parents**

1.      Jennifer Hamilton is an adult at least 18 years old and parent of minor child C.M.H.

2.      Jennifer Hamilton and C.M.H. are citizens and residents of Cabarrus County, North Carolina.

3.      Jennifer Hamilton is authorized to assert legal claims on behalf of C.M.H.

4.      Susan Hunter is an adult at least 18 years old and parent of minor children E.R.H. and O.E.H.

5.      Susan Hunter, E.R.H., and O.E.H. are citizens and residents of Cabarrus County, North Carolina.

6.      Susan Hunter is authorized to assert legal claims on behalf of E.R.H. and O.E.H.

7.      Samantha Hatchell is an adult at least 18 years old and parent of minor child H.P.H.

8.      Samantha Hatchell and H.P.H. are citizens and residents of Mecklenburg County, North Carolina.

9.      Samantha Hatchell is authorized to assert legal claims on behalf of H.P.H.

10.     Seretha Davis-Robinson is an adult at least 18 years old and parent of minor child S.A.D.

11.     Seretha Davis-Robinson and S.A.D. are citizens and residents of Mecklenburg County, North Carolina.

12.     Seretha Davis-Robinson is authorized to assert legal claims on behalf of S.A.D.

13.     Braunte Mowbray is an adult at least 18 years old and parent of minor child

K.A.H.

14.     Braunte Mowbray and K.A.H. are citizens and residents of Mecklenburg County,

North Carolina.

15.     Braunte Mowbray is authorized to assert legal claims on behalf of K.A.H.

16.     Reese Blackshear is an adult at least 18 years old and parent of minor children

Q.B. and E.B.

17.     Reese Blackshear, Q.B., and E.B. are citizens and residents of North Carolina.

18.     Reese Blackshear is authorized to assert legal claims on behalf of Q.B. and E.B.

19.     Ketra Chambers is an adult at least 18 years old and parent of minor child A.C.

20.     Ketra Chambers and A.C. are citizens and residents of Gaston County, North

Carolina.

21.     Ketra Chambers is authorized to assert legal claims on behalf of A.C.

22.     Arinne Coleman is an adult at least 18 years old and parent of minor children

MAR.N. and MAL.N.

23.     Arinne Coleman, MAR.N. and MAL.N. are citizens and residents of Mecklenburg

County, North Carolina.

24.     Arinne Coleman is authorized to assert legal claims on behalf of MAR.N. and

MAL.N.

25.     Jessica Garris-Wilson is an adult at least 18 years old and parent of minor children

J.W. and J.G.

26.     Jessica Garris-Wilson, J.W., and J.G. are citizens and residents of North Carolina.

27.     Jessica Garris-Wilson is authorized to assert legal claims on behalf of J.W. and J.G.

**B.      Defendant Bonnie Cone Leadership Academy**

28.     Bonnie Cone Leadership Academy, L.L.C. ("BCLA") is a tuition-free publicly funded charter school located in Mecklenburg County, North Carolina.

29.     BCLA is incorporated as a private limited liability company in North Carolina.

30.     BCLA provides public educational services to students in grades 7 through 12.

31.     BCLA, pursuant to Article IX, Section 2, of the North Carolina State Constitution (the "State Constitution") and Article14A of Chapter 115C of the North Carolina General Statutes (the "N.C. Gen. Stat."), is a public school subject to the laws applicable thereto.

32.     BCLA's charter, or contract, was granted by the State to delegate the State's public educational services to BCLA.

33.     BCLA is accountable to the North Carolina State Board of Education for "ensuring compliance with applicable laws and the provisions of [its] charter[]." N.C. Gen. Stat. § 115C-218.15(a).

34.     Based on its relationship with the State of Northan Carolina described above, BCLA acts under color of state law.

**C.      Defendant Charter One**

35.     Defendant Charter One, L.L.C. ("Charter One") is a private limited liability company incorporated in Arizona and registered to do business in North Carolina.

36.     Despite its private incorporation, Charter One, at all times relevant, acted under color of state law and must be designated as a state actor subject to the same laws applicable to BCLA as a public charter school (including the State Constitution).

37. Charter One is a private, for-profit education management organization ("EMO").

38. As an EMO, Charter One provides all-inclusive comprehensive education management services to approximately 50 public charter schools across the United States. Ten of those charter schools are located in North Carolina, including BCLA and its sister lower-school, Bonnie Cone Classical Academy ("BCCA").

39. Charter One's education management services include providing operations, curriculum, facilities, accounting, academics, marketing, human resources, information technology, and legal compliance to public charter schools.

## JURISDICTION, VENUE, AND JOINDER

40. This Complaint arises under, *inter alia*, 42 U.S.C. § 12131 *et seq*. (Title II of the Americans with Disabilities Act of 1990, as amended), which prohibits discrimination on the basis of disability by public entities. Accordingly, this Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (relating to federal question jurisdiction) and 28 U.S.C. § 1333(a)(3) (relating to equal rights actions).

41. To the extent that any claims set forth herein are not wholly within the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331-1333, this Court has supplemental jurisdiction over the remaining state court claims pursuant to 28 U.S.C. § 1367.

42. This Court has personal jurisdiction over the Defendants.

43. BCLA's campus is located in Mecklenburg County, North Carolina.

44. Charter One provides services to BCLA, where at least one of Charter One's employees was, at all times relevant, the director of BCLA who was present on campus.

5

45.     Charter One is registered with the State to do business in North Carolina, maintains an office in North Carolina, and operates multiple schools in North Carolina (including the greater Charlotte, North Carolina area).

46.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are corporations subject to personal jurisdiction in this District.

47.     Venue is also proper in this District because the facts supporting the claims in this Complaint occurred in this District.

48.     Joinder of claims is permitted under Rule 18 of the Federal Rules of Civil Procedure ("FRCP").

49.     Joinder of parties is appropriate under FRCP 19 or 20.

## FACTS COMMON TO ALL CLAIMS

### A.     BCLA and Charter One

50.     The State Constitution and BLCA's contract with the North Carolina State Board of Education require BCLA to provide all of its students with a "sound basic education."  N.C. Const. art. I, § 15 and art. IX, § 2.

51.     BCLA is obligated to admit any child who meets the qualifications for public school admission, in accordance with N.C. Gen. Stat. § 115C-218.45(a).

52.     Therefore, all students admitted to BCLA meet the eligibility requirements for public school enrollment.

53.     BCLA is further obligated to provide reasonable accommodations to qualified students with disabilities, in accordance with Title II of the Americans with Disabilities Act of 1990, as amended (the "ADA").

54.     Charter One generates substantial revenue from its EMO services.

6

55.     Upon information and belief, Charter One provides services to BCLA in exchange for 15% of BCLA's revenue (the statutory-authorized maximum).

56.     This revenue comes mostly, if not entirely, from public sources.

57.     Based on this fee structure, Charter One has an inherent financial incentive to recruit and enroll as many students as possible at BCLA.

58.     Glenn Way, the chief executive officer of Charter One, believes that operating a charter school is "no different than building a Walmart, CVS or Walgreens."

59.     Upon information and belief, Charter One's profit motive includes policing its reputation by removing negative publicity from the internet, including, specifically, Google search results concerning lawsuits against Charter One.

60.     Regardless of whether Charter One is contracted by BCLA's board of directors to provide recruitment services, multiple BCLA administrators are Charter One employees.

61.     Upon information and belief, Charter One strongly influences BCLA's recruitment and enrollment policies and practices.

62.     Upon information and belief, Defendants have sought to grow revenue by increasing enrollment as much as possible.

63.     One reason that BCLA selected Charter One as its EMO was Charter One touting its ability to achieve full enrollment very quickly.

64.     As a result, BCLA opened before its facility was approved and all students attended virtual classes for months.

65.     BCLA has been understaffed since it opened, and many employees are not qualified to provide proper attention and support to the number of students at BCLA.

66.     For example, BCLA did not have a math teacher for certain courses for a large part of the 2023/2024 school year.  BCLA's exceptional children ("EC") program was, in particular, negatively affected by these problems.

67.     Defendants' minimal, inadequate, and bad faith EC services and Defendants' failure to stop harassment cannot be fully explained by understaffing alone.

68.     Defendants could have attempted to improve these issues by, among other things, hiring additional qualified staff, providing training to current staff, and hiring a qualified and unbiased investigator to respond to reports and complaints of discrimination, harassment, and bullying.

69.     Doing the remedial acts described above, however, would have eaten into Defendants' bottom line.

70.     Defendants' actions throughout the year made it clear that, once Defendants had recruited their students and cashed their paychecks, their jobs were done.

71.     Defendants consistently neglected BCLA's most vulnerable and marginalized students to the extent that, not only were those students deprived of a quality education, they suffered severe physical, mental, and emotional harm (as well as educational and career-based opportunities) that their only viable option was withdrawal.

**B.     Jennifer Mognett**

72.     Jennifer Mognett was a Charter One employee who was the director of BCLA at all times relevant to the claims in this Complaint.

73.     Director Mognett is a key figure to the claims asserted by each Plaintiff in this case, as explained further below.

74.    Despite being a Charter One employee, Director Mognett's business email signature only held her out as the director of BCLA.

75.    Upon information and belief, as a result of the problems at BCLA (including, but not limited to those set forth in this Complaint), Defendants demoted Director Mognett and relocated her to a different Charter One-managed school in South Carolina.

76.    Defendants were not transparent about Director Mognett's demotion and reassignment.

77.    BCLA's board of directors informed BCLA parents that Director Mognett had accepted another employment opportunity and thanked Director Mognett for her services.

78.    Upon information and belief, through Director Mognett and other Charter One employees, Charter One essentially ran BCLA like a for-profit corporation with little more than a rubber stamp from BCLA's board of directors.

79.    As long as BCLA's reputation and profits were unaffected, the board appeared satisfied.

80.    As the facts below show, the chair of BCLA's board of directors was informed of serious issues multiple times by multiple people and largely failed to respond until faced with the prospect of litigation.

81.    Director Mognett, with assistance by BCLA administrators, attempted to protect Defendants' reputations by keeping both issues and complainants quiet.

82.    Once Plaintiffs found each other following news coverage about the problems at BCLA, they realized the systemic nature of those problems.

83.    Upon information and belief, Director Mognett was appointed director of BCLA more out of loyalty to Defendants than qualifications.

## C. Disability Discrimination, Deliberate Indifference to Harassment

84. Plaintiffs contend that Defendants engaged in disability discrimination, were indifferent to harassment, retaliated against employees for protected complaints, and tolerated racial discrimination, prioritizing their reputation and profits over student safety and well-being.

85. Specifically, Defendants: (a) engaged in disability discrimination by (i) treating disabled students differently, including testing them in a segregated environment with less instruction and exam preparation time than non-disabled peers, (i) depriving them of equal access to academic services, programs, and activities, and (iii) treating them unfairly in disciplinary processes; (b) engaged in race discrimination by targeting black students for discipline and issuing them more severe sanctions, typically through ad hoc procedures and biased investigations; (c) were deliberately indifferent to harassment (including harassment on the basis of protected classes like sex and disability) of which they had actual knowledge and an ability to address; (d) retaliated against employees who made legally-protected external complaints or reports in order to discourage employees from doing anything that might reflect negatively on Defendants; and (e) tolerated racial discrimination and harassment, among other appalling behaviors that prioritized Defendants' reputations and profits over the students' safety, learning, and general well-being.

86. Despite Plaintiffs' constant, diligent efforts to convince Defendants to address these problems, as further stated herein, the Defendants maintained a hostile and unsupportive academic environment where Plaintiffs were deprived of their rights to a sound basic education, subjected to discrimination, and forced to endure an unsafe educational environment where it was not only difficult to learn, but some Plaintiffs suffered physical injury that could have been prevented.

87.     Upon information and belief, Defendants' non-compliance with the ADA, Title VI of the Civil Rights Act, and other such laws was deemed an acceptable cost of running a highly profitable education business under the guise of being a public charter school.

88.     Sadly, Defendants' violation of the above law to further their bottom line came at the Plaintiffs' expense, as set forth in the facts section of each Plaintiff below.

## DEFENDANTS' UNCONSTITUTIONAL AND DISCRIMINATORY TREATMENT OF PLAINTIFFS

89.     While each of the Plaintiffs were students in different grades, had different disabilities and learning needs, Defendants applied the same unconstitutional and discriminatory policies and practices to all Plaintiffs.

### C.M.H.

#### Failure to Provide Sound Basic Education Because of Disability Discrimination and Deliberate Indifference to Harassment

90.     At all times relevant to the causes of action herein, C.M.H. was a ninth-grade student at BCLA during the 2023-2024 academic year.

#### Disability Discrimination Against C.M.H.

91.     C.M.H. has been diagnosed with autism, anxiety, attention deficit hyperactivity disorder ("ADHD"), and sensory processing disorder.

92.     At all times relevant, C.M.H. was a qualified student requiring disability-related accommodations.

93.     Since the beginning of the 2023-2024 academic year however, Defendants have failed to adequately accommodate C.M.H.'s disability and failed to engage in a meaningful interactive process.

94.     C.M.H's mother, Ms. Hamilton's made several requests during the 2023-2024 academic year to modify C.M.H.'s accommodations because C.M.H. was not making sufficient academic progress.

95.     Defendants also failed to allow for Ms. Hamilton's meaningful participation in the interactive process.

96.     Specifically, Defendants did not provide certain accommodations or services to C.M.H., including the individualized instruction that C.M.H. needed.

97.     Defendants only occasionally pulled C.M.H. from the classroom to provide a separate testing environment to accommodate his disability which, upon information and belief, was only to "paper" Defendants' records.

98.     Despite having a grade of "D" in his math course and testing "below" the satisfactory level, Defendants discontinued C.M.H.'s accommodations and services for math in January 2024, stating that C.M.H. did not qualify.

99.     When Defendants discontinued C.M.H.'s accommodations and services for math in January 2024, Ms. Hamilton objected and stated that, without this accommodation, C.M.H. would fail because C.M.H. was still having trouble with basic math.

100.    Defendants responded that it would be unfair to provide them to C.M.H. because other disabled students did not receive such services and accommodations.

101.    When Ms. Hamilton objected, Defendants asked her to sign a form.

102.    Ms. Hamilton admittedly did not read the form before signing and was led by Defendants to believe the form was what every parent signed to acknowledge an EC meeting.

103.    In reality, the form stated that Ms. Hamilton had agreed that Defendants would stop providing C.M.H.'s accommodations and services in math, despite her clear objection.

12

104.     Defendants then declined to modify C.M.H.'s accommodations and services, despite Ms. Hamilton's requests.

105.     Defendants stated that C.M.H. should just go to tutoring.

106.     C.M.H. struggles even more with reading than math.

107.     C.M.H.'s reading comprehension is well below the satisfactory level because C.M.H. cannot pronounce half of the words in assignments.

108.     Despite some effort by one reading teacher who worked with C.M.H., none of the EC teachers implemented C.M.H.'s accommodations or services in reading.

109.     Defendants' justification for failing to implement these accommodations or services was simply that C.M.H. was passing, so he did not need extra help.

110.     When Ms. Hamilton informed the Defendants that C.M.H. was only passing because Ms. Hamilton did the assignments with C.M.H. at night so C.M.H. would not fail and have to repeat ninth-grade, Defendants were unmoved and again stated that because C.M.H. was passing, no accommodation was needed.

111.     Because of Defendants' actions and omissions, C.M.H. did not make adequate academic progress.

112.     Ms. Hamilton is concerned that C.M.H. will lack the academic and life skills required to work and function as an independent adult, especially once Ms. Hamilton is no longer alive or able to help him.

113.     C.M.H. is continuing to fall further behind his peers and has not shown satisfactory performance for his grade-level.

13

## Harassment of C.M.H.

114.    Beginning with in-person classes in October 2023, C.M.H. was subjected to repeated and severe harassment by another male student likely based on C.M.H.'s disabilities.

115.    The male student, at varying times during the school day:

a.    repeatedly took pictures on his cell phone of C.M.H. at school, despite C.M.H. informing the male student that it was unwelcome and asking him to stop;

b.    persistently pestered, hugged, and positioned face-to-face with C.M.H.; and

c.    made statements like, "I love you" and "Tell me you love me" directly to C.M.H. to elicit a reaction related to C.M.H.'s disabilities and to cause C.M.H. to become embarrassed and visibly uncomfortable.

116.    Ms. Prescott, the art teacher, directly observed and was informed by C.M.H. of the male student's harassment.

117.    Despite being required by school policy and the School Violence Prevention Act to report such harassment to the appropriate administrator, Ms. Prescott only temporarily resolved the matter each time by asking the male student to leave C.M.H. alone.

118.    The harassment then resumed each time.

119.    Ms. Prescott knew or should have known that her response was not effective in protecting C.M.H. from continued harassment.

120.    After winter break, the male student's harassment of C.M.H. grew more aggressive.

121.    Defendants' failure to appropriately respond emboldened the harasser.

122.    Ms. Prescott moved the male student to a seat directly in front of C.M.H. (which made no sense when the students could have been placed on opposite sides of the classroom).

14

123.    There, in addition to the behaviors stated above, the male student destroyed C.M.H.'s pencils, licked papers before passing them back to C.M.H., and repeatedly instructed C.M.H. to call the male student a "nigger."

124.    Even though C.M.H. did not know what the term meant until C.M.H. asked his mother, the requests made C.M.H. very uncomfortable.

125.    As a result of Defendants not taking appropriate action to stop the male student's harassment, C.M.H. experienced significant emotional distress (crying at home to his mother most days after school), elevated stress and anxiety, and other concerning changes in behavior. C.M.H.'s academic interest and abilities declined.

126.    Ms. Hamilton began taking C.M.H. to therapy to process what was happening at school and learn how to regulate C.M.H.'s emotional response and how to cope (which was especially difficult due to the combination of C.M.H.'s disabilities).

127.    After C.M.H. made multiple unsuccessful appeals to Ms. Prescott to help him, Ms. Hamilton contacted Jennifer Bonfiglio, BCLA's dean of students.

128.    Ms. Hamilton reported that the situation involved harassment and was urgent.

129.    Dean Bonfiglio replied that she was out sick until the next week and Ms. Hamilton's concerns would have to wait.

130.    Ms. Hamilton did not understand why another administrator could not assist or provide interim measures until Dean Bonfiglio returned.

131.    Because of the emotional distress and academic decline that C.M.H. was experiencing, Ms. Hamilton did not wait for Dean Bonfiglio to return.

132.     The next day, Ms. Hamilton went to BCLA's campus in person to find a different administrator who might help.  Ms. Hamilton did not find any such administrator (there is a recurring issue with BCLA administrators being absent when needed).

133.     Lower-level administrators could not locate anyone to take a complaint.

134.     Ms. Hamilton did not know where to find BCLA's policies and procedures, nor did she know who to contact.

135.     Not knowing where to turn, Ms. Hamilton called the police.

136.     The police officer arrived on campus, spoke privately with an unknown school administrator, and then reported that BCLA was asking Ms. Hamilton to just be patient and give the school time to address the situation at a later time.

137.     Despite the unknown school administrator's response, Defendants did not address the situation, and the harassment (and its negative effects) continued.

138.     Director Mognett, a Charter One employee and the director of BCLA, knew that C.M.H. was being harassed and that Ms. Hamilton had come looking for support.

139.     Despite knowing this, there was no investigation nor disciplinary action taken against the male student who was harassing C.M.H.

140.     Upon information and belief, Director Mognett did not take action because the harasser was on the basketball team, was otherwise a good student, and reports of harassment must be reported externally and Director Mognett did not want BCLA's harassment statistics to look bad.

141.     With the harassment continuing unabated for months, Ms. Hamilton sought help from Ms. Eilers, an assistant director under Director Mognett.

142. When Ms. Hamilton reported the harassment to Ms. Eilers, Ms. Eilers responded that the harassment was serious, should not have been allowed to continue, and that the male student should have been suspended.

143. Ms. Hamilton agreed.

144. Ms. Eilers promised to conduct an investigation.

145. However, there was no discussion about any BCLA policies and procedures, Ms. Hamilton and C.M.H.'s rights and options, interim measures, or protection from retaliation.

146. As a result, C.M.H. was further afraid about whether the male student might retaliate against C.M.H. for making a complaint.

147. A few hours after their meeting, Ms. Eilers called Ms. Hamilton with the results of her investigation.

148. Ms. Eilers stated that the male student denied the accusations, claiming that he and C.M.H. were good friends and that he was showing affection and joking around.

149. Even though Ms. Prescott admitted to Ms. Eilers that the male student had been "pestering" C.M.H., Ms. Eilers essentially found that "he said, she said" testimony was insufficient to discipline the harasser.

150. Ms. Eilers' hours-long investigation was woefully insufficient.

151. The insufficiency of Ms. Eilers' investigation is not surprising because Ms. Eilers is not sufficiently trained nor experienced to conduct disciplinary investigations in an educational setting.

152. Ms. Eilers' investigation was incomplete, unfair, and ineffective.

153. Ms. Eilers' efforts did not stop the harassment, remedy its effects, or prevent its reoccurrence.

154.     As a consolation, Ms. Eilers offered to move C.M.H. to a different class.  The offer to move C.M.H. rather than the harassing student to another classroom, would have effectively punished C.M.H. for Ms. Hamilton's report of harassment.

155.     Ms. Hamilton declined the offer to move C.M.H. to a different class.

156.     Ms. Eilers then requested time to consider other options.

157.     Ms. Eilers never followed up, and Defendants did not provide any accommodations or supportive measures to C.M.H., nor did they discipline the harasser.

158.     As a consequence, the harassment against C.M.H. continued.

159.     C.M.H. has observed other instances of harassment of disabled students being tolerated at BCLA.

160.     Specifically, C.M.H. saw wet paper towels being thrown at disabled BCLA students.

161.     Upon information and belief, Defendants knew about such harassment and did not take appropriate action to address it.

162.     Upon information and belief, BCLA did not have working security cameras (which could provide evidence in "he said, she said" cases), officers, or other measures to promote a safe campus, as Defendants had indicated to parents.

163.     Once a parent learned of Defendants' misrepresentation concerning working security cameras, that parent complained and thinks Defendants may have installed some thereafter to cover their tracks.

164.     In February 2024, Ms. Hamilton finally decided that she could not continue to send C.M.H. to BCLA.

165.     Ms. Hamilton withdrew C.M.H. on March 1, 2024.

166.    C.M.H. was homeschooled as a stop-gap until Ms. Hamilton could enroll C.M.H. at a safer private school which, unfortunately, will cost around $15,000 per year.

167.    Ms. Hamilton and C.M.H. have lost faith in the public school system where C.M.H. was deprived of a fair opportunity to attend.  C.M.H. is still seeing a therapist as a result of Defendants' inaction.

168.    Defendants had substantial control over the harassment and the harasser.

169.    The harassing conduct described above occurred during school hours, on school premises, in the presence of school employees, and the harasser was a student subject to Defendants' disciplinary policies.

170.    Defendants had actual knowledge of the harassment.

171.    Ms. Hamilton and C.M.H. repeatedly implored teachers and administrators with authority to take corrective measures to stop the harassment.

172.    BCLA policy and the School Violence Prevention Act required all employees to notify the appropriate school administrator so the harassment could be addressed.

173.    Defendants exhibited deliberate indifference to the harassment, hiding behind an insufficient investigation, failing to provide appropriate accommodations and other supportive measures, and not taking other sufficient actions to promptly stop the harassment, eliminate its effects, and prevent its reoccurrence.

174.    As a result of Defendants' inaction, BCLA was a hostile environment in which C.M.H. did not make adequate academic progress or receive a sound basic education.

175.    The hostile environment, combined with the lack of disability-related support, is inexcusable for educators.

176.     As a result of Defendants' acts and omissions described above, C.M.H. suffered severe emotional distress and has been receiving ongoing therapy to process and heal from the harassment.

### Susan Hunter, E.R.H., and O.E.H.

### Failure to Provide Sound Basic Education Because of
### Disability Discrimination, and Retaliation

177.     At all times relevant to the causes of action herein, Susan Hunter was a teacher at BLCA and her children E.R.H. and O.E.H. were ninth-grade students at BCLA during the 2023-2024 academic year.

### Disability Discrimination Against E.R.H. and O.E.H.

178.     E.R.H. is a Hispanic student who has been diagnosed with ADHD, fetal alcohol spectrum disorder, post-traumatic stress disorder ("PTSD"), mood disorder, and anxiety.

179.     O.E.H. is a Hispanic student who has been diagnosed with ADHD, pre-natal alcohol exposure, PTSD, mood disorder, and anxiety.

180.     At all times relevant, E.R.H. and O.E.H. were qualified students approved to receive disability-related accommodations and services.

181.     Upon information and belief, Defendants were not sufficiently trained concerning the ADA, the interactive process, accommodations, record-keeping, or working with disabled students.

182.     E.R.H. and O.E.H.'s teachers were not informed of the accommodations and services they required.

183.     Instead, Ms. Hunter had to inform E.R.H. and O.E.H.'s teachers of their accommodations and services to ensure they would be provided.

184. However, since the beginning of the 2023-2024 academic year, Defendants failed to properly accommodate both E.R.H. and O.E.H.

185. Defendants also failed to engage in a meaningful interactive process to modify their accommodations and services when E.R.H. and O.E.H. were not making sufficient academic progress.

186. Specifically, the Defendants:

    a. failed to provide the same amount of instruction time as non-disabled students for at least part of the academic year;

    b. failed to provide E.R.H. and O.E.H. with specialized individual instruction;

    c. failed to maintain service or progress monitoring records;

    d. failed to provide modifications to O.E.H.'s accommodations and services when requested;

    e. failed to provide pull-out EC services. Instead of providing pull-out services, EC services were provided in the general education setting. This ostracized and embarrassed E.R.H. and O.E.H. by showcasing their disabilities in front of their peers; and

    f. failed to engage in a meaningful interactive process to find more effective accommodations or to modify their current accommodations and services, despite Ms. Hunter's multiple requests for Defendants to do so.

187. For months, Ms. Hunter repeatedly advocated for Defendants to implement her children's accommodations and services to ensure E.R.H. and O.E.H could make sufficient academic progress.

188.     Because Defendants failed to implement accommodations and services, E.R.H. and O.E.H. both struggled academically and were deprived of equal access to BCLA's services, programs, and activities.

189.     Defendants failed to provide O.E.H. with specialized individual instruction and pull-out services.

190.     Because of Defendants' failure to provide accommodations and services, O.E.H. maintained a failing grade in math.

191.     Defendants excused their non-compliance with the ADA by citing understaffing as the reason they could not fully provide E.R.H. and O.E.H's accommodations and services.

192.     Defendants did not take reasonable action to correct the understaffing, which would have eaten into their bottom line.

193.     The Defendants' repeated failures to support E.R.H. and O.E.H. caused them and Ms. Hunter to experience significant and unnecessary stress, anxiety, and exhaustion.

194.     In particular, E.R.H. began to suffer frequent panic attacks that she had never experienced before attending BCLA.

195.     E.R.H. and Ms. Hunter attribute E.R.H.'s panic attacks to E.R.H.'s experience in BCLA's EC program.

196.     E.R.H., who had previously enjoyed school and learning, told Ms. Hunter on multiple mornings that E.R.H. did not want to go to school.

197.     After Ms. Hunter made multiple unsuccessful attempts to get Defendants to support her children in light of their disabilities, Ms. Hunter filed a complaint with the North Carolina Department of Public Instruction ("NC DPI") on March 25, 2024.

198.     NC DPI thoroughly investigated Ms. Hunter's complaint and found that BCLA had failed to provide several of both E.R.H. and O.E.H.'s legally-required accommodations and services.

199.     Ms. Hunter was especially concerned about O.E.H.'s failure to make academic progress.

200.     In a last-ditch effort to salvage O.E.H.'s ninth-grade year, Ms. Hunter withdrew O.E.H. from BCLA in the middle of the school year.

201.     Ms. Hunter saw this mid-year transfer as necessary for O.E.H. to receive a sound basic education; however, the transfer was stressful and inconvenient for the Hunters.

202.     Transferring schools was also disruptive to O.E.H.'s education and schedule, having to adapt to his second new school in an academic year.

203.     The Hunters also had to coordinate transportation for two children to different schools.

204.     None of this would have been necessary if Defendants had performed their jobs at even a minimally satisfactory level.

205.     Defendants administered end-of-course tests ("EOCs") to disabled students, including E.R.H., in a segregated setting 10 days before non-disabled students.

206.     This was a one-size-fits-all policy made by Defendants without consideration for the students' individual disabilities or their accommodations.

207.     In addition to segregation causing E.R.H. shame and embarrassment amongst her peers, as well as additional stress and anxiety, E.R.H. was deprived of important extra exam preparation that non-disabled students received.

208.     As a result of the Defendants' actions and omissions, E.R.H. failed her Math I EOC test.

209.     If E.R.H. had received her accommodations and services, as well as equal treatment for study time, Ms. Hunter believes E.R.H. would have passed.

210.     As a result of Defendants' actions and omissions, E.R.H. was deprived of current and future educational and economic opportunities.

211.     Ms. Hunter withdrew E.R.H. after the 2023-2024 academic year so E.R.H. can attend a school that will provide accommodations and services, and ensure E.R.H. has sufficient academic support to have a fair opportunity to succeed and receive a sound basic education.

212.     After raising concerns and stating intent to transfer, Defendants simply sent Ms. Hunter a transfer form without further discussion.

213.     When Ms. Hunter requested her students' education records (including records of disabilities and related accommodations) to send to their new school, Defendants did not send them.

214.     As of the date of filing this Complaint, Defendants have still not provided compensatory services or reimbursement to E.R.H. or O.E.H. for Defendants' failure to provide special education services.

215.     Defendants' actions in paragraph 214, incorporated by reference, violated the deadline given by NC DPI.

**Associational Disability Discrimination and Retaliation Against Susan Hunter**

216.     Susan Hunter was, at all times relevant, a teacher for BCLA during the 2023-2024 academic year.

217.     Before joining BCLA, Ms. Hunter was a teacher at the BCCA.

218.    BCLA and BCCA have the same board of directors, and both schools are managed and operated by Charter One.

219.    At all times relevant, Ms. Hunter was a great teacher who received excellent performance evaluations while employed by BCCA and BCLA.

220.    On February 23, 2024, Ms. Hunter received her most recent performance evaluation.

221.    Ms. Hunter's evaluation was, again, excellent without any negative comments or concerns expressed by Defendants.

222.    On February 29, 2024, BCLA invited Ms. Hunter to renew her teaching contract for the upcoming 2024-2025 academic year.  Ms. Hunter planned to accept the offer.

223.    Around January 2024, Ms. Hunter learned that a minor student at BCLA had been sexually abused in her home.

224.    Around April 2024, Ms. Hunter noticed a minor student with bruises and other signs of physical injury.

225.    On both occasions, Ms. Hunter properly informed Director Mognett, Dean Bonfiglio, and the school nurse that the incidents needed to be reported to the state's Department of Social Services ("DSS") in compliance with state law.

226.    On both occasions, Director Mognett appeared annoyed and stated that the reports did not need to be made.

227.    Director Mognett then stated that, if Ms. Hunter disagreed, Ms. Hunter needed to make the reports herself.

228.    Director Mognett directed Ms. Hunter to handle the situation when DSS arrived.

25

229.	Based on her interaction with Ms. Director Mognett, Ms. Hunter formed the impression that, if Ms. Hunter had not reported those instances of child abuse, they would not have been reported at all.

230.	Upon information and belief, Defendants made significant efforts to keep incidents that would reflect poorly on them quiet.

231.	It was not until the parents bringing this Complaint found each other that the systemic extent and seriousness of Defendants' wrongful conduct began coming to light, as they learned other parents had experienced the same or similar types of mistreatment and harm by the Defendants.

232.	After Defendants received notice on April 1, 2024 of Ms. Hunter's March 25, 2024 disability discrimination complaints to the NC DPI, Defendants' behaviors toward Ms. Hunter suddenly changed.

233.	Defendants disciplined Ms. Hunter with a formal write-up and placed her on a performance improvement plan ("PIP") for illegitimate reasons—reasons that Defendants knew about before Ms. Hunter's performance evaluation in February 2024 and for which Defendants did not discipline other similarly-situated employees.

234.	At some point in April 2024, BCLA withdrew its invitation for Ms. Hunter to renew her contract.

235.	Defendants refused to tell Ms. Hunter the reason for its decision, citing undisclosed "complaints" against her.

236.	Ms. Hunter had not been informed of any such complaints or reason they might exist.

237.     Upon information and belief, Ms. Hunter asserts that Defendants' stated reason for termination was pretextual and Defendants put her on a PIP and decided to not renew her contract because Ms. Hunter made disability discrimination complaints to NC DPI.

238.      Upon information and belief, Defendants' retaliatory actions against Ms. Hunter were calculated to deter other employees of Defendants from making any complaints, including those of a legally protected nature that negatively reflect on Defendants.

239.     Even if Defendants did not have such intent, the Defendants' actions have a deterrent effect and demonstrate Defendants' prioritization of their reputation over students' learning and safety.

240.     Ms. Hunter has suffered, and continues to suffer, economic loss and emotional distress.

## H.P.H.

### Failure to Provide Sound Basic Education Because of Disability Discrimination and Retaliation

241.     At all times relevant to the causes of action herein, H.P.H. was a ninth-grade student at BCLA during the 2023-2024 academic year.

242.     H.P.H. has been diagnosed with attention-deficit disorder, sensory processing disorder, and specific learning disabilities related to math and English language arts caused by a traumatic brain injury at birth.

243.     At all times relevant, H.P.H. was a qualified student with approved disability-related accommodations and services.

244.     Since the beginning of the school year in August 2023, Ms. Hatchell has repeatedly advocated for Defendants to implement H.P.H.'s accommodations and services to ensure H.P.H. could make sufficient academic progress.

27

245.     Ms. Hatchell's requests were specifically directed to math teacher Mr. Soloman and EC teacher Danielle Carter.

246.     Despite Ms. Hatchell's diligent efforts, and the unnecessary stress, anxiety, and exhaustion that resulted from her efforts, Defendants were uncooperative and largely responded with superficial and ineffective actions.

247.     Defendants have not been transparent when Ms. Hatchell asks questions about H.P.H.'s education, including her accommodations and services, or requested other information.

248.     Specifically, the Defendants:

    a.   failed to ensure that H.P.H. received appropriate benchmark testing in math, which is H.P.H.'s weakest subject;

    b.   resisted engaging in an interactive process with Ms. Hatchell to implement and modify H.P.H.'s accommodations and services, despite repeated requests by Ms. Hatchell to do so;

    c.   failed to provide H.P.H. with approved specialized instruction;

    d.   failed to be present on multiple occasions when H.P.H. needed support;

    e.   failed to notify teachers about H.P.H.'s accommodations and services.  On one occasion, H.P.H.'s math teacher Mr. Soloman disputed whether H.P.H. required an accommodation.  Mr. Soloman then pulled H.P.H. out into the hallway during class, in front of H.P.H.'s peers, to discuss her disability and accommodation which was embarrassing;

    f.   shortened instruction for disabled students, including H.P.H; and

    g.   engaged in disparate treatment disability discrimination by requiring all disabled students, regardless of individual disabilities or accommodations, to

take EOCs in a segregated setting 10 days before their non-disabled peers.
Not only did this segregated exam setting ostracize and embarrass H.P.H., but
it deprived her of much needed additional instruction and exam preparation
time that non-disabled students enjoyed.

249.    As a result of Defendants' failures to provide several of H.P.H.'s accommodations
and services, H.P.H. did not make adequate academic progress or receive a sound basic
education. In fact, H.P.H. was failing math the entire time she was at BCLA.

250.    Despite repeated attempts by Ms. Hatchell, Defendants failed to engage in the
interactive process to identify and implement accommodations for H.P.H.

251.    Rather than take responsibility for their shortcomings or try to provide actual
support to H.P.H., Defendants instead sent Ms. Hatchell a false progress report.

252.    Defendants sent Ms. Hatchell what was purportedly a ninth-grade progress report
for H.P.H. that was actually a year-old progress report from H.P.H.'s eighth-grade year, with
only the date changed.

253.    All other information had been copied and pasted from H.P.H.'s previous
progress report.

254.    Upon information and belief, Defendants sent this false progress report in an
attempt to deceive Ms. Hatchell into thinking H.P.H. was making academic progress and to
conceal the fact that H.P.H. was falling further behind.

255.    Ms. Hatchell, a single mother and nurse, took time off work—foregoing much-
needed pay—on multiple occasions to assist H.P.H. academically where Defendants were not
providing sufficient support.

29

256.    Ms. Hatchell was forced to pay out-of-pocket more than $2,000 for Mathnasium and Sylvan to provide the specialized instruction that BCLA was legally required to provided as one of H.P.H.'s approved accommodations and services.

257.    On January 19, 2024, Ms. Hatchell contacted NC DPI to request assistance.

258.    When NC DPI was unable to convince Defendants to make improvements through informal measures, NC DPI opened an investigation into Ms. Hatchell's complaint.

259.    Following a thorough investigation, NC DPI found that BCLA had failed to provide H.P.H.'s disability accommodations and services, as well as failed to engage in a meaningful interactive process to develop, review, and revise H.P.H.'s accommodations and services.

260.    NC DPI notified BCLA that BCLA needed to remedy its failures regarding H.P.H.'s accommodations and services.

261.    On or about May 7, 2024, Defendants sent an agreement containing BCLA's proposed remedy to Ms. Hatchell.

262.    BCLA's proposed remedy only offered to reimburse Ms. Hatchell for transportation services and not the myriad other services that Defendants failed to provide.

263.    Defendants' offer was also conditioned on Ms. Hatchell releasing all legal claims against Defendants and waiving Defendants' liability for their acts of non-compliance.

264.    Ms. Hatchell refused to sign the agreement, and Defendants did not make an improved effort to assist H.P.H.

265.    Because BCLA failed to provide H.P.H. with sufficient academic support, H.P.H. fell further behind in both her academic abilities and her life skills.

266. Ms. Hatchell has been very concerned that H.P.H. will not be prepared for adulthood and a career after H.P.H. graduates (if she graduates). H.P.H. has lost educational and economic opportunities as a result of Defendants' failures to provide her with a sound basic education.

267. On May 8, 2024, Defendants removed H.P.H.'s basic math services, which taught functions that H.P.H. would use as an adult (i.e., addition, subtraction, multiplication, division), against Ms. Hatchell's wishes.

268. BCLA's reason for taking away H.P.H.'s basic math services was that H.P.H. had supposedly met proficiency standards.

269. Ms. Hatchell later learned that BCLA had lowered the proficiency standard for H.P.H. by five points without informing Ms. Hatchell, so that H.P.H. could be classified as proficient despite no improvement.

270. When Ms. Hatchell objected, stating that H.P.H. is not fluent in basic math and still needs those services, BCLA responded that H.P.H. should "just use a calculator."

271. Ms. Hatchell believes BCLA took this adverse action, as well as ignored H.P.H.'s outside counselor's recommendations for modifying accommodations, in retaliation for Ms. Hatchell filing the NC DPI complaint.

272. BCLA employees became increasingly obstinate and uncooperative after learning of Ms. Hatchell's NC DPI complaint.

273. Ms. Hatchell was concerned that, in addition to H.P.H. failing her current math course, H.P.H. may even need to repeat ninth-grade.

31

274.    To the extent H.P.H. made any academic progress at BCLA, the progress is attributed to the private tutors at Sylvan that Ms. Hatchell had to hire, not BCLA (which is very expensive).

275.    Ms. Hatchell and H.P.H. struggled to work with BCLA administrators for the entire 2023-2024 academic year.  Ms. Hatchell and H.P.H. did not expect perfection, only a good faith effort to help H.P.H. learn and make adequate academic progress.  Defendants did not make such an effort.

276.    Ms. Hatchell and H.P.H. could not endure another year at BCLA.  Ms. Hatchell planned to transfer H.P.H. to a school where H.P.H. would get proper support.  Having to transfer yet again would be very disruptive to H.P.H.'s education and schedule, and likely cause more stress and anxiety.

277.    As of the date of filing this Complaint, Defendants have neither provided compensatory services to H.P.H. nor reimbursement for the private tutoring Ms. Hatchell had to pay for out-of-pocket.

278.    Defendants' failure in paragraph 277, incorporated by reference, violated the deadline provided by NC DPI to do so.

## S.A.D.

### Failure to Provide Sound Basic Education Because of
### Deliberate Indifference to Harassment, Disability Discrimination, and
### Racial Discrimination

279.    At all times relevant to the causes of action herein, S.A.D. was an eighth-grade African American student at BCLA during the 2023-2024 academic year.  S.A.D. has been diagnosed with ADHD and dyslexia.  At all times relevant, S.A.D. was a qualified student approved to receive disability-related accommodations and services.

## Teacher Harassment of S.A.D.

280. S.A.D. played football for BCLA in fall 2023.

281. In May 2024, S.A.D. learned that he had not been selected as the football team's most valuable player ("MVP").

282. On or about May 18, 2024, S.A.D. made a post on his private Instagram page expressing disappointment about not being named the MVP. Without mentioning the chosen MVP or any other specific person by name in the Instagram post, S.A.D. posted his opinion that he should have received the MVP award.

283. Nicole White, a BCLA employee and mother of a football player, was offended by S.A.D.'s Instagram post and reported S.A.D. to Dean Bonfiglio for disciplinary action.

284. For no apparent reason, Dean Bonfiglio instructed S.A.D. to apologize to Ms. White.

285. This coerced apology was unjustified because S.A.D. had not caused Ms. White any harm and he had not violated any BCLA policies.

286. On June 4, 2024, Defendants suspended S.A.D. without investigating Ms. White's unverified claims that S.A.D. allegedly intended to fight the chosen MVP.

287. S.A.D. adamantly denies ever expressing or having an intention to fight anyone and had not engaged in any behavior indicating such intention.

288. S.A.D. was, at all times relevant, a well-behaved student with no prior disciplinary record at BCLA.

289. Much like Ms. Eilers' hours-long investigation described above, Defendants unwillingness to conduct a thorough and fair investigation into the complaint against S.A.D. demonstrates a pattern of indifference to harassment and discrimination.

290. Defendants' inconsistent, arbitrary, and capricious disciplinary procedures are evidence of their disparate treatment of disabled students and racial minorities.

291. After S.A.D. was suspended, Ms. White told Defendants that Ms. Davis-Robinson had threatened her.

292. Without any further investigation into the truthfulness of Ms. White's statement, Dean Bonfiglio trespassed Ms. Davis-Robinson from BCLA's campus.

293. Defendants barred S.A.D. from taking the final exam in his science course, which made it likely that S.A.D. would fail the course.

294. Defendants also barred S.A.D. from attending summer school.

295. In light of S.A.D.'s disabilities and disability-related academic struggles, Defendants' actions severely, unnecessarily, and unfairly jeopardized S.A.D.'s academic progress and deprived him of a sound basic education.

296. Further, Defendants' decision to trespass Ms. Davis-Robinson from campus made it more difficult for her to advocate for S.A.D. amidst Defendants' disability discrimination (see section immediately below for additional facts).

297. Because of Defendants' actions and omissions, S.A.D. was deprived of access to services, programs, and activities at BCLA.

298. After an attorney emailed Director Mognett on June 6, 2024 to discuss these concerns (to which email the attorney received no response), Ms. Davis-Robinson received an email from a Charter One employee within hours falsely claiming that Ms. Davis-Robinson had never been banned from campus, that S.A.D. was able to take his science final on campus, and that S.A.D. could attend summer school at BCLA.

299. Further, the Charter One employee informed Ms. Davis-Robinson that the human resources staff had opened an investigation into Ms. Davis-Robinson's concerns about Ms. White.

300. A Charter One employee stated in the email referenced above that Director Mognett had gone to look for S.A.D. to discuss the matter but S.A.D. was not present.

301. Director Mognett either knew or should have known that S.A.D. was still suspended based on Ms. White's false accusations.

302. Upon information and belief, without an attorney, Defendants would not have reversed their unfounded and arbitrary decisions.

303. Chris Elliott, a Charter One employee, emailed Ms. Davis-Robinson to inform her that Defendants' human resources team had concluded its investigation and "took action in alignment with our employee code of conduct."

304. Not knowing what that meant, Ms. Davis-Robinson requested the outcome of the investigation.

305. Mr. Elliott declined to provide any further information.

306. Upon information and belief, despite Ms. White's misconduct, she was not disciplined.

### Disability Discrimination Against S.A.D.

307. Ms. Davis-Robinson and S.A.D. have repeatedly advocated for Defendants to implement S.A.D.'s accommodations and services to ensure S.A.D. could make sufficient academic progress.

308. Defendants have largely failed to do so, especially concerning S.A.D.'s testing accommodations.

309.    Ms. Davis-Robinson has had to request multiple EC meetings to ensure that the Defendants were providing S.A.D.'s accommodations and services.

310.    However, Defendants rushed these EC meetings, not taking time to engage in a meaningful interactive process as required by the ADA.

311.    Defendants failed to consistently provide daily one-on-one support in math and reading, which was an approved accommodation.

312.    Defendants failed to provide S.A.D. with extra time on multiple tests and quizzes, another approved accommodation.

313.    Because Defendants did not provide several of S.A.D.'s accommodations and services, S.A.D. has struggled to keep up with his peers academically.

314.    S.A.D. has not made adequate academic progress or received a sound basic education.  There is noticeable decline in S.A.D.'s grades and test scores since attending BCLA as compared with his previous school where he received his accommodations and services.

315.    Defendants administered S.A.D.'s end-of-grade testing without any accommodations.

316.    Despite Ms. Davis-Robinson attempts to obtain S.A.D.'s test scores, Defendants have not provided them.  Ms. Davis-Robinson and S.A.D. feared that S.A.D. failed and would need to repeat eighth-grade.

317.    Upon information and belief, the results were available and being withheld from Ms. Davis-Robinson due to Defendants having received notice of legal action.

318.    S.A.D. and his parents were greatly concerned about S.A.D.'s academic progress, S.A.D.'s unmet needs remediation, and whether S.A.D. is prepared for ninth-grade.

36

319.     S.A.D. did not make sufficient academic progress at BCLA.  S.A.D. and his parents did not trust BCLA to provide a sound basic education.  They thought summer school at BCLA would be a waste of time.  They considered enrolling S.A.D. in a summer school and remediation at another school, where S.A.D. would receive proper accommodations, services, and academic support.

320.     Ms. Davis-Robinson also heard conflicting stories from Defendants about whether she was allowed back on campus, so she did want want to take S.A.D. there out of fear of being cited for trespass.  She believed Defendants would do something like that, consistent with their character.

321.     Defendants deprived S.A.D. of educational and economic opportunities as a result of their above wrongful actions.

322.     Defendants ended up transferring S.A.D. back to public school, where he is struggling with larger class sizes and lack of individual attention.  Defendants' actions also caused S.A.D. to fall behind his peers academically, and he is struggling to try to catch up.

### Racial Harassment

323.     S.A.D. has heard his social studies teacher, Mr. Raburn, say "nigger" and other racial epithets in class on multiple occasions.

324.     These racially charged remarks are unwelcome and offensive, and resulted in S.A.D. experiencing severe emotional distress.

325.     Persistent use of racial epithets creates a hostile environment that hinders students' abilities to learn, including S.A.D.'s learning ability.

326.     Teachers and multiple parents of BCLA students have complained to Charter One, BCLA, and BCLA's board of directors about racial harassment and racial disparities in

37

discipline. See, e.g., Queen City News article at https://www.yahoo.com/news/parents-huntersville-charter-school-concerned-032256961.html.

327.     Upon information and belief, these problems have largely gone unaddressed.

## **K.A.H.**

**Failure to Provide Sound Basic Education Because of
Deliberate Indifference to Student Harassment and Teacher Harassment**

328.     At all times relevant to the causes of action herein, K.A.H. was a ninth-grade African American student at BCLA during the 2023-2024 academic year.

329.     K.A.H. has been a good student and member of the cheerleading team.

330.     For several months during the 2023-2024 academic year, two female students harassed, bullied, and threatened K.A.H.

331.      K.A.H. was afraid of bodily harm and experienced significant stress, anxiety, depression, and humiliation.

332.     K.A.H. missed substantial time from school, both to avoid the hostile environment at BCLA and to focus on her mental health.

333.     K.A.H.'s grades suffered as a result of the hostile environment at BCLA.

334.     During those months, on multiple occasions, Ms. Mowbray complained to Defendants, asking for their help and protection from Defendants (including, specifically, Director Mognett and Dean Bonfiglio).

335.     Like the experience of other Plaintiffs, Defendants' employees often could not be found.  When they were on-site, they did not take action to address Ms. Mowbray's concerns.

336.     Defendants' inaction only encouraged the two female students to continue to harass, bully, and threaten K.A.H

337. On or about January 11, 2024, Ms. Mowbray received a phone call informing her that those two female students had threatened K.A.H.'s life and then confronted K.A.H. in the school cafeteria to provoke a physical altercation.

338. K.A.H. was so afraid of bodily harm that she ran out of the cafeteria to the main office to seek protection.

339. Ms. Mowbray and her family went to BCLA's campus and called the police.

340. Director Mognett was not present, and Dean Bonfiglio had not taken action to protect K.A.H. despite her knowledge of the harassment.

341. Seeing no alternative, Ms. Mowbray withdrew K.A.H. from BCLA in the middle of the school year.

342. Even after K.A.H. had left BCLA, the two female students continued to harass, bully, and threaten K.A.H by electronic communication and admitted in writing to wanting to physically hurt K.A.H. at BCLA during the incident that occurred on or about January 11, 2024.

343. Ms. Mowbray and K.A.H. obtained restraining orders against one of the female students (a restraining order was not issued to the other student).

344. Upon information and belief, at least one of those two female students has a criminal record.

345. Defendants knew or should have known about the criminal records (which indicate the threat should be taken seriously), especially when those students were threatening physical harm to one of their students.

346. Defendants knew about the harassment, embarrassment, and threats that K.A.H. was enduring and were deliberately indifferent to it, leaving K.A.H. to suffer alone without any accommodations, supportive measures, or other resources that might help.

347.    In addition to the student harassment, K.A.H. (and other students) experienced harassment from their cheerleading coach.

348.    Specifically, the cheerleading coach did the following at practice:

    a.   consistent yelling and cursing directed at the students, who were minors;

    b.   belittling students' abilities, telling one girl that she was lucky to even be on the team;

    c.   permitting unfair treatment, bullying, and singling out students for personal attacks within the team, despite having knowledge of such behaviors;

    d.   arranged a dance formation based on a student's skin color, which was "too dark" for a certain spot; and

    e.   upon information and belief, other similarly concerning behaviors.

349.    Ms. Mowbray complained against the cheerleading coach by submitting a formal grievance.

350.    Defendants did not take appropriate disciplinary action.  As a result, K.A.H. and other students quit the team.

351.    The combination of harassment by the two female students during school and the cheerleading coach after school caused K.A.H. so much severe emotional distress and fear that, when Defendants did not act to stop it, K.A.H. was deprived of equal access to an education and a sound basic education at BCLA.

## Q.B. and E.B.

**Failure to Provide Sound Basic Education Because of
Deliberate Indifference to Harassment and Disability Discrimination**

### Harassment of Q.B. and E.B.

352. At all times relevant to the causes of action herein, Q.B. and E.B. were both 11th-grade African American students at BCLA during the 2023-2024 academic year.

353. Q.B. and E.B. have attention-deficient disorder but do not receive any accommodations or services for their disabilities.

354. Q.B. and E.B. both experienced severe and repeated harassment and bullying at BCLA.

355. E.B. had been bullied by other students on multiple occasions at BCLA.

356. On or about November 15, 2023, E.B. was the victim of a dangerous and terrifying physical assault where another student pinned him to the floor with a knee on his neck.

357. Defendants did not take appropriate disciplinary action against the offending student, despite the incident occurring as a result of overly lax supervision by a BCLA coach.

358. No protocols or policies were in place to ensure E.B.'s safety and well-being.

359. When Ms. Blackshear tried to press criminal charges, Director Mognett withheld critical information from the police that resulted in no charge being filed.

360. Ms. Blackshear believed that the criminal charge was necessary to protect E.B. and deter future violence (especially since Defendants were not doing so through school policy).

361. Upon information and belief, Director Mognett withheld the information to protect Defendants' reputations.

362. After the assault incident was not appropriately resolved, Ms. Blackshear engaged Charter One officials and attended a board meeting with several parents and a news crew to discuss serious issues at BCLA.

363.     Following this meeting, Director Mognett, Dean Bonfiglio, and Kyle King (a BCLA board member) held an inappropriate public forum with Q.B. and E.B. as participants without Ms. Blackshear's parental permission.

364.     Q.B. and E.B. felt pressured to discuss personal matters that made them feel very uncomfortable.

365.     On one occasion, Dean Bonfiglio embarrassed one of Ms. Blackshear's sons (Q.B. or E.B.) in front of his peers by suddenly and tightly grabbing his arm, and then calling for backup when he pulled away. Dean Bonfiglio made derogatory remarks directed at him and tried to force him down the hallway.

366.     Ms. Blackshear's son was not initially suspended but, after Ms. Blackshear contacted the school to discuss what happened, Ms. Blackshear received an email from the Defendants stating that her son was being suspended.

367.     Upon information and belief, the Defendants changed the sanction to suspension in retaliation against Ms. Blackshear for challenging the appropriateness of their actions.

368.     On another occasion, a teacher (upon information and belief, Mr. Egri) publicly humiliated E.B. in front of the class so badly that another student suggested E.B. should kill himself.

369.     Q.B., who was in the same class, felt helpless and hurt by the teacher's actions and the students' responses.

370.     Despite Ms. Blackshear bringing her concerns to Defendants, the Defendants did not take appropriate action to address them.

371.     Ms. Blackshear believes that Director Mognett and Dean Bonfiglio were to blame.

42

372.    They knew about the seriousness and pervasiveness of the harassment and other issues occurring at BCLA, yet they did not take action to address them.

373.    These ongoing incidents have left Q.B. and E.B. emotionally and mentally traumatized.

374.    They need support and accountability from the school to ensure their safety and well-being.  Instead, they were forced to try to learn in a hostile environment that Defendants did not appear to show any interest in addressing.

375.    The above incidents, and the general experience of dealing with Defendants at BCLA, have caused significant emotional, physical, and financial strain to the Blackshear family.

376.    Because of Defendants, Ms. Blackshear made the difficult decision to withdraw both sons from BCLA only three months before the end of the school year.

377.    Withdrawing from school greatly disrupted their high school educations, but they believed it was better than continuing to attend BCLA.

378.    Ms. Blackshear is selling her home, where she and her sons have lived for the past four years.  She plans to move to a different school district where Q.B. and E.B. can learn in a safe educational environment that holds its employees and students accountable.

379.    As a result of Defendants' actions and omissions, Q.B. and E.B. continue to experience emotional and mental trauma from these events and desperately need counseling.

380.    Specifically, E.B. showed signs of depression, a decline in grades and class participation, and a change in his demeanor.

381.     E.B., for the first time, expressed having suicidal thoughts.

382.    Q.B. is suffering from extreme stress, anxiety, frustration, and uncertainty about his future as his life is in the process of being uprooted.

383.    Q.B. frequently asked to miss school because he was not feeling well to avoid attending.

### Disability Discrimination Against Q.B. and E.B.

384.    Plaintiffs Q.B. and E.B. were, at all times relevant, qualified students at BCLA who had been diagnosed with Attention-Deficit Disorder ("ADD").

385.    Defendants are legally required to identify and evaluate students who have or may have disabilities.

386.    Upon information and belief, Defendants knew or should have known that Q.B. and E.B. had disabilities based on their status as disabled students and the manifestations of their disabilities.

387.    Defendants should have evaluated Q.B. and E.B. for disability-related accommodations and services at BCLA, but Defendants neglected to do so.

388.    Because of Defendants' actions and omissions, neither Q.B. nor E.B. received the needed accommodations, services, and resources that would have put them on an equal footing with their peers and given them access to BCLA's services, programs, and activities.

389.    In addition to the stress and anxiety of trying to learn with unaccommodated disabilities, Q.B. and E.B. suffered worse grades and test scores due to Defendants' failures to identify, evaluate, and accommodate their ADD.

390.    Defendants' failures to provide Q.B. and E.B. with a sound basic education deprived them of educational and economic opportunities.

### A.C.

**Failure to Provide Sound Basic Education Because of
Disability Discrimination and Deliberate Indifference to Harassment**

391.    At all times relevant to the causes of action herein, A.C. was a seventh-grade

African American student at BCLA during the 2023-2024 academic year.

## <u>Disability Discrimination Against A.C.</u>

392.    At all times relevant to the causes of action herein, A.C. was disabled or regarded

as such by BCLA.

393.    A.C. was approved to receive disability-related accommodations and services for

his delayed learning abilities.

394.    A.C. struggled to learn throughout the 2023-2024 academic year.

395.    Specifically, in math, BCLA reported that A.C. demonstrated "[l]imited progress

due to extra time needed" on multiple objectives.

396.    A.C. did not make appropriate progress in applying the concepts of fair shares and

equal shares to divide using visuals, as well as solving two-factor multiplication problems (A.C.

has difficulty grasping the concept of multiplication being repeated addition).

397.    In reading, BCLA reported that A.C. demonstrated "[l]imited progress due to

extra time needed" on multiple objectives.

398.    A.C. did not make appropriate progress in being able to engage in discussions

about literature, even with prompting by the teacher.

399.    A.C. has also had difficulty making adequate progress with speech and language

skills, word relationships, and has not made progress on improving grammatically correct simple

sentences.

400.    Accordingly, A.C. is not making adequate progress or catching up with peers on

the goals and expectations set by BCLA, nor is A.C. receiving a sound basic education at BCLA.

401.    In addition to not making adequate progress on learning in a number of areas, BCLA's progress report showed A.C. backtracking on progress, going from adequate progress early in the year to limited/inadequate progress later in the year.

402.    A.C.'s mother, Ketra Chambers, was concerned about A.C.'s lack of adequate progress and inability to learn at BCLA.

403.    Moreover, Defendants did not implement the disability-related accommodations and services that were necessary for A.C. to learn and make adequate academic progress.

404.    Ms. Chambers made diligent efforts to get Defendants to provide appropriate support and resources to A.C., but Defendants largely failed to do so.

405.    Moreover, Defendants provided A.C. with at least 1,800 fewer minutes (30 hours) of instruction than his non-disabled students.

406.    To make up that time, Defendants offered to let A.C. make up those hours during the summer.

407.    Despite not trusting the Defendants to provide a quality education (based on Ms. Chambers' and A.C.'s experiences all year), Ms. Chambers accepted.

408.    When those summer sessions started, the instructor failed to show up without giving Ms. Chambers or A.C. prior notice. They were waiting on the instructor and had to contact Ms. Eilers to ask what was happening. No instructor was available.

409.    Upon information and belief, the instructor who was supposed to provide make-up hours was unqualified to provide EC services.

410.    Parents were notified that the summer school that was supposed to be provided will be rescheduled for the fall.

411.    It is unclear how students with disabilities will be able to make adequate academic progress next year when they are still one year behind in the areas in which they already struggle.

412.    These students may need to repeat a grade or be set up to fail next year.

413.    Upon information and belief, this problem will negatively affect other Plaintiffs who are still at BCLA.

414.    Because of Defendants actions and omissions, Ms. Chambers and A.C. experienced much unnecessary stress and anxiety.

415.    A.C. did not make adequate academic progress.  A.C. has fallen even further behind his peers, and Ms. Chambers fears A.C. may not graduate from high school, be prepared for adulthood, or be able to have a career after school.

416.    A.C. has been deprived of educational and economic opportunities.

417.    To the extent A.C. made any academic progress, Ms. Chambers attributes it to Kumon, the private tutor she hired to provide the proper instruction that A.C. should have received at BCLA.

418.    Ms. Chambers had to pay Kumon $150.00 per month, starting in September 2023.

**Harassment of A.C.**

419.    Throughout the 2023-2024 academic year, A.C. experienced repeated verbal and physical harassment and bullying by a group of white students at BCLA.

420.    A.C. was physically "attacked" in the bathroom, the cafeteria, and the gym.

421.    There were few places where A.C. felt safe – A.C. needed to stay in the presence of teachers for protection.

422. This defense strategy deprived A.C. of access to locations, programs, and opportunities at BCLA that A.C. otherwise wanted to experience.

423. Defendants knew that A.C. was being harassed and bullied.

424. A former BCLA teacher named Somer Stanley personally witnessed the group of white students attacking A.C. in the cafeteria in early 2024.

425. Ms. Stanley had already informed Director Mognett and Dean Bonfiglio that the same group of white students had been harassing some of Ms. Stanley's students (including African American, disabled, and Muslim students on the basis of their legally-protected classes).

426. Ms. Stanley advocated for months for Defendants to take action to address the harassment and bullying that was rampant at BCLA.

427. Defendants did not take action to protect student victims, including A.C.

428. The harassment and bullying continued and, because Defendants did nothing, A.C. also became a victim.

429. In early 2024, Ms. Stanley reported the group of white students to Director Mognett and Dean Bonfiglio. They did not respond.

430. After a few days, Ms. Stanley followed up.

431. Ms. Stanley met with administration, who did not appear to take Ms. Stanley's allegations seriously. They stated that they had spoken with the students and concluded that the group of white students were only joking around and playing with A.C.

432. Ms. Stanley, who witnessed A.C. in a chokehold, stated they did not have all of the facts.

433.    Ms. Stanley knew that A.C., as a result of his disabilities, could not verbally communicate nearly as well as his attackers (and A.C. did not receive any accommodations during Defendants' "investigation" to help A.C. communicate what really happened).

434.    Defendants did not inform A.C.'s parents about the incident and the attackers were not disciplined for their harassment and bullying.

435.    Dissatisfied, Ms. Stanley contacted Rev. Martin McCarthy, the chairman of the board of directors for BCLA and BCCA and reported the rampant harassment and bullying, the racial disparities in discipline, and other issues at BCLA.

436.    Rev. McCarthy was not interested in taking any action to address Ms. Stanley's concerns.

437.    Rev. McCarthy made statements that seemed to defend the administrators and the harassers.  Among other appalling statements, Rev. McCarthy told Ms. Stanley, "Those students mostly come from C.M.S. and they're animals."

438.    Ms. Stanley's heart sank as she realized Defendants were "rotten from the top" and it was unlikely that the harassment would ever be appropriately addressed unless it started to reflect poorly on Defendants' reputations or impact the school's profitability.

439.    About one or two weeks after Ms. Stanley spoke with Rev. McCarthy, some of the white students who had been harassing A.C. were appointed leaders and mentors in an ambassador group.

440.    Ms. Stanley was frustrated, as those students did not display character that should have been rewarded by Defendants.

441.    On February 14, 2024, Ms. Stanley was suspended for no apparent reason.

442.     Later, Ms. Stanley was fired.

443.     Ms. Stanley, who had been an excellent teacher with multiple recognitions and awards while at BCLA, formed the impression that Defendants (upon information and belief, under direction by Rev. McCarthy) had retaliated against her for advocating on behalf of students being harassed and bullied (including A.C.).

444.     Upon information and belief, Ms. Stanley is pursuing separate legal action against Defendants.

445.     Because of Defendants' actions and omissions, A.C. experienced severe and constant fear, stress, anxiety, and emotional distress.

446.     A.C. was too embarrassed to tell his family.

447.     Ms. Chambers suspected something was wrong when A.C. became withdrawn, did not want to go to school, and made statements about harming himself.

448.     After Defendants failed to step in, the harassment and bullying escalated.  At some point, the attackers put A.C. in a chokehold that made it difficult to breathe.

449.     Out of intense fear and self-defense, A.C. finally fought back in March 2024.

450.     As a result of defending himself, Defendants suspended A.C. for three days.

451.     Upon information and belief, no action was taken against the students who had been harassing A.C. because they were white.

452.     After being terminated, Ms. Stanley informed Ms. Chambers about A.C. being harassed and bullied at BCLA.

453.     Defendants had never informed Ms. Chambers that her son was being harassed and bullied, even when the chokehold endangered A.C.'s health.

454.     As a result, Ms. Chambers mistakenly believed that A.C. was suspended for fighting that was A.C.'s fault.

455. Defendants' failure to inform Ms. Chambers about the events involving A.C. prevented her from supporting and protecting A.C. (and possibly preventing the further harassment, including the chokehold, from occurring).

456. Ms. Chambers still does not know all of the details concerning A.C.'s harassment and bullying because A.C. has difficulty talking about it (partly due to how his disabilities affect his mental processing and verbal communication, and partly due to his embarrassment about the situation).

457. Defendants still have not been transparent about what happened, despite Ms. Chambers' requests for information, to which she is entitled under the Family Educational Rights and Privacy Act of 1974 ("FERPA").

458. Upon information and belief, Defendants intentionally concealed the rampant bullying and harassment of A.C. and other students to protect their own reputations.

459. Plaintiffs have collectively seen and heard about multiple instances of Defendants withholding material information and lying to protect themselves from their own failures.


### MAR.N. and MAL.N.

**Failure to Provide Sound Basic Education Because of
Deliberate Indifference to Harassment and Racial Discrimination, and,
for MAR.N., Disability Discrimination**

460. At all times relevant to the causes of action herein, MAR.N. and MAL.N. were eighth-grade and ninth-grade African American students, respectively, at BCLA during the 2023-2024 academic year.

### Harassment of MAR.N. and MAL.N. by BCLA Cheerleading Coach and Students

461. Prior to enrolling at BCLA for the 2023-2024 academic year, MAR.N. and MAL.N. attended a different school in the Charlotte, North Carolina area.

462. In July 2023, the cheerleading coach observed MAR.N.'s tumbling abilities and was impressed. The cheerleading coach recruited MAL.N. to BCLA, promising that MAR.N. would cheer on BCLA's varsity team. MAR.N. was excited by the opportunity and accepted.

463. After cheer team try-outs, the cheerleading coach informed MAL.N. that MAR.N. would be on the junior varsity team.

464. MAR.N.'s abilities at try-outs were the same as what the cheerleading coach had witnessed when promising to put MAR.N. on the varsity team.

465. MAR.N. was devastated because she had left her other school and friends for the sole purpose of being on the varsity cheer team in eighth-grade.

466. The cheerleaders had constant issues and concerns with their coach throughout the year.

467. The cheerleading coach created so much stress, anxiety, and division within the team that their mother, Arinne Coleman, was selected to be a liaison between parents and the coach.

468. Otherwise, Ms. Coleman believes the coach's actions would have caused the team to fall apart, which the students (including MAR.N. and MAL.N.) did not want to happen.

469. The cheerleading coach required students, including MAL.N., to spend more than $1,000 on uniforms, snacks, and other expenses.

470. Ms. Coleman and other parents do not know how that money was spent, but they were concerned that the money did not go toward their children.

471. For instance, the parents purchased snacks that Ms. Coleman and other parents learned were being kept at the coach's home and the students never received.

472. On one occasion, Ms. Coleman shared private medical records concerning MAR.N. with the cheerleading coach and specifically instructed the coach to keep them private.

473. Ms. Coleman later learned that the coach had shared those records with at least one other teacher.

474. Ms. Coleman reported a FERPA violation to Director Mognett, who said the coach would be disciplined.

475. To Ms. Coleman's knowledge, such discipline did not occur.

476. Ms. Coleman and other parents experienced multiple occasions when Director Mognett and other employees of Defendants made the "right" statements to appease parents in the moment and then did not do what they had promised.

477. On another occasion, the cheerleading coach placed both MAR.N. and MAL.N., who was also a cheerleader, on academic probation despite having good grades.

478. The coach sat them on the sidelines during practice and falsely told the other cheerleaders that MAR.N. and MAL.N. were not practicing because they were on academic probation.

479. Ms. Coleman went to Director Mognett and learned that, not only did the cheerleading coach not have authority to place students on academic probation, but MAR.N. and MAL.N.'s names were not on the list of students on academic probation that Director Mognett had sent to the coach.

480. Director Mognett promised to figure out what had happened, but Ms. Coleman does not know whether she did. Ms. Coleman never heard back from Director Mognett.

481.    On another occasion, the cheerleading coach "chewed out" MAR.N. in front of the team, stating that MAR.N. had a "nasty attitude" and "thinks [she's] all of that", which is the reason MAR.N. did not make the varsity team.

482.    The cheerleading coach's statements were false and highly inappropriate to make in front of other students.

483.     The assistant director of student services, Phillip Nazak, told multiple students, including MAL.N., that they'll "never be smart enough to play sports" and other degrading statements.

484.    When Ms. Coleman confronted Mr. Nazak about the statement, he admitted it but denied doing so "in that tone."

485.    On another occasion, a teacher named Mr. Raburn called a student "a worthless piece of trash."

486.    Shocked at what they were hearing from a teacher, MAR.N. recorded Mr. Nazak's statements and took the recording to Dean Bonfiglio.

487.    Dean Bonfiglio instructed the students to delete the recording, which they did, and told them "don't go ratting [Mr. Raburn] out to your parents before giving us a chance to address it."

488.    Upon information and belief, once the recording was deleted, Dean Bonfiglio did not appropriately address the incident.

489.    Later, Ms. Coleman asked Dean Bonfiglio whether this happened.  Dean Bonfiglio stated that it did, but she listened to the recording and did not hear anything inappropriate.

490. Ms. Coleman then asked Dean Bonfiglio why she deleted the recording. Dean Bonfiglio quickly redirected the conversation.

491. Ms. Coleman and other parents observed that Dean Bonfiglio also had a habit of saying the "right" things to placate parents and students but not following through.

492. It seemed like Dean Bonfiglio just wanted to get matters off her plate at the time and hope they went away, as well as to protect the Defendants' reputations.

493. On another occasion, the cheerleading coach sent two cheerleaders into class to confront MAL.N. about something the coach had heard.

494. Sometimes, the cheerleading coach herself would stand in the doorway of the classroom and stare down MAL.N., making her feel unsafe.

495. The teacher allowed all of this to happen, which was against the rules and disrupted the learning environment.

496. At least one other parent confronted Defendants about the same behavior affecting that parent's child.

497. One male student harassed and picked on MAR.N. for two days in a row.

498. Ms. Coleman was upset and reported the incidents to Dean Bonfiglio.

499. Dean Bonfiglio did not respond.

500. The next day, the same male student slapped MAR.N. in the face.

501. Outraged, Ms. Coleman went to the school in person.

502. Dean Bonfiglio stated, in her typical fashion, that she would investigate the matter and respond by the end of the day. Later that day, Dean Bonfiglio called Ms. Coleman.

503. Dean Bonfiglio stated that she had spoken with a couple of students who were witnesses, and they denied seeing any of the male student's misconduct.

55

504. When Ms. Coleman asked for the names of the witnesses, she learned from MAR.N. that they were friends of the male student.

505. No disciplinary action was taken.

506. The next day, the male student and his friends started calling MAR.N. a "snitch."

507. On a separate occasion, the cheerleading coach sent two cheerleaders to confront and intimidate MAL.N. in the cafeteria, accusing MAL.N. of having issues with another cheerleader.

508. On the bus ride home that day, MAL.N. called her mother (Ms. Coleman) frantic and in tears, scared and in severe emotional distress about what happened.

509. Ms. Coleman called BCLA and requested a meeting with an administrator. The administrator responded that he does not do unscheduled meetings but offered to meet the next morning.

510. When they met, he informed Ms. Coleman that he would try to address the situation but was unsure he could since the cheerleading coach gives BCLA a lot of "good opportunities and exposure."

511. The Defendants' repeated failures to respond to harassment emboldened harassers and created an unsafe learning environment for victims, including MAR.N. and MAL.N.

512. MAR.N. and MAL.N. were constantly fearful and intimidated at school.

513. The Defendants' failures to make BCLA a safe learning environment negatively affected MAR.N. and MAL.N.'s grades (making it hard to concentrate and pay attention during class) and attendance.

514. On multiple occasions, Ms. Coleman felt bad for what her daughters were experiencing at BCLA and let them stay home from school.

56

515.    Their physical and mental health and safety were more important than their educations at that point (which should never have had to be a choice).

516.    MAR.N. and MAL.N. both developed depression from their time at BCLA.

517.    Ms. Coleman had to enroll them in regular counseling.

518.    Ms. Coleman observed that "they're not the same students anymore" (in reference to the negative effects caused by attending BCLA).

519.    Ms. Coleman expressed the above concerns about school safety to Defendants on multiple occasions, but her concerns largely fell on deaf ears.

520.    After Dean Bonfiglio and Director Mognett did not take sufficient action, Ms. Coleman met with Rev. Martin McCarthy.

521.    Mr. McCarthy was very dismissive and did not appear to care. He seemed to just want to avoid negative press by covering-up everything bad that was happening at BCLA.

522.    Rev. McCarthy downplayed Ms. Coleman's concerns, stating that some students "are just animals."

523.    Upon information and belief, Rev. McCarthy did not take appropriate action to make Defendants respond to the problems of school safety, harassment, and failures to respond to reports and complaints of harassment at BCLA.

524.    Ms. Coleman formed the impression that Defendants place significant effort on recruiting students to BCLA but then neglect them after enrollment.

525.    "It was a wasted year," Ms. Coleman stated. "My kids didn't learn anything."

526.    Ms. Coleman believes that enrolling her children at BCLA was her "worst parenting mistake."

527.     She tried to transfer her children back to their prior school but was unable to do so.

528.     Because of Defendants' actions and omissions, MAR.N. and MAL.N. were deprived of a sound basic education.  MAL.N. developed, and has been diagnosed by a therapist with, acute post-traumatic stress disorder.

529.     MAR.N. developed, and has been diagnosed by a therapist with, adjustment disorder with mixed disturbance of emotions and conduct.

530.     Neither Plaintiff had these conditions before attending BCLA.

**Disability Discrimination Against MAR.N.**

531.     MAR.N. was diagnosed with a math learning disability in fourth- or fifth-grade, which disability MAR.N. still struggled with at BCLA.

532.     MAR.N. received disability-related accommodations and services at her prior school that Defendants were supposed to have transferred over to BCLA with MAR.N.'s other records, but Defendants failed to do so.

533.     In November 2024, when MAR.N. was improperly suspended for 10 or more days after being with a student who had a vape device in her purse (which vape device MAR.N. did not use and which witnesses informed Defendants did not belong to MAR.N.), Ms. Coleman asked an administrator about MAR.N.'s rights as a disabled student.

534.     The administrator left to check MAR.N.'s records and, upon return, the administrator denied that MAR.N. had record of any disability or accommodations on file.

535.     Ms. Coleman learned for the first time that Defendants had not been providing MAR.N.'s approved disability accommodations and services for months.

58

536.     Even after learning that MAR.N. had a learning disability, Defendants did not evaluate MAR.N. or provide disability-related services or accommodations that MAR.N. needed to be on an equal footing with her peers and receive a sound basic education.

537.     Defendants' failure to evaluate MAR.N. and provide her with appropriate accommodations and services, combined with the above-described failures to address harassment by the cheerleading coach and students, MAR.N.'s grades fell and she did not make adequate academic progress.

538.     To make matters worse, BCLA did not have a math teacher for MAR.N. for most of the year.

539.     Students, including MAR.N. and MAL.N., were "face-timing" (or video-chatting) their parents during class.

540.     When Ms. Coleman asked how they were able to do that, they responded that BCLA did not have enough staff to teach the course.

541.     There was a teacher who sat in but, upon information and belief, the teacher did not teach math (nor was the teacher qualified to do so).

**Racial Discrimination**

542.     At one point, Defendants gave MAR.N. detention for using her phone at school.

543.     Defendants did not discipline other similarly situated white students.

544.     There was a no-cell phone policy, but it was selectively enforced with inconsistent discipline.

545.     Ms. Coleman observed many well-behaved African American students like MAL.N. who were disciplined for misconduct for which the white students received no discipline or less discipline.

546.    A teacher named Mr. Raburn called a group of African American students, who were friends of MAR.N., racist terms.

547.    This offended MAR.N. and negatively affected the learning environment for African American students at BCLA (including MAR.N.).

548.    The students reported Mr. Raburn to Dean Bonfiglio, who promised to investigate.

549.    Dean Bonfiglio informed the students that she was investigating a few similar complaints of a racist nature and would follow-up.

550.    Dean Bonfiglio never followed up, and the students did not know whether the incident was appropriately addressed.

551.    Upon information and belief, like the other incidents involving the Plaintiffs, it was not.

## J.W. and J.G.

### Failure to Provide Sound Basic Education Because of
### Disability Discrimination

552.    At all times relevant to the causes of action herein, J.W. and J.G. were eighth-grade and ninth-grade students, respectively, at BCLA during the 2023-2024 academic year.

553.    J.W. and J.G. were, at all times relevant, qualified students with disabilities who were approved to receive accommodations and services at BCLA.

554.    Defendants failed to provide several of J.W. and J.G.'s accommodations and services, including instruction time.

555.    J.W. received segregated early testing based on her disabilities, which deprived her of important instruction and study time, as well as embarrassed her in front of her peers.

556. J.W. and J.G. were damaged as a result of Defendants' actions and omissions. They were deprived of educational and economic opportunities.

557. As a teacher, Ms. Garris-Wilson could not afford private tutoring services.

558. Ms. Garris-Wilson has personally provided tutoring for both J.W. and J.G. to compensate for the accommodations and services that Defendants failed to provide.

559. Without doing so, Ms. Garris-Wilson believes that both children would have fallen behind their peers and performed worse in school and on standardized tests.

**COUNT I**

**Disability Discrimination, Failure to Accommodate and
Failure to Interact in Violation of Title II of the Americans with Disabilities Act**

560. Plaintiffs re-allege and incorporate by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

561. Defendants are each a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

562. Under the ADA, public entities also include instrumentalities of the State of North Carolina. 42 U.S.C. § 12131(1)(B).

563. Plaintiffs were, at all times relevant, qualified students with disabilities, qualified students regarded as disabled, or qualified students with a record of being disabled within the meaning of 42 U.S.C. § 12102.

564. The ADA mandates that public entities make reasonable modifications to policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability, as stated in 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.130(b)(7).

565. Plaintiffs required disability-related accommodations and services that were necessary to provide them with equal access to Defendants' services, programs, and activities, or

had disabilities for which they should have been identified and evaluated for such accommodations and services.

566.    Defendants had an ongoing duty to engage in an interactive process with Plaintiffs and/or their parents or guardians to identify and implement necessary accommodations.

567.    Defendants failed to engage in an interactive dialogue, assess the needs of Plaintiffs, discuss potential accommodations, ensure that appropriate modifications were implemented, ignored repeated requests for meetings to address accommodations, and refused to consider reasonable accommodations that would have addressed Plaintiffs disabilities.

568.    Defendants intentionally violated Plaintiffs' rights under the ADA and its regulations by excluding them from participation in and denying them the benefit of Defendants' services, programs, and activities, on the basis of disability, and by subjecting them to discrimination in violation of 42 U.S.C. § 12132.

569.    Defendants intentionally, willfully, wantonly, and recklessly treated Plaintiffs differently on the basis of their disabilities, including by placing them in a segregated testing environment with less study time than non-disabled peers and by not providing accommodations and services necessary to put Plaintiffs on an equal footing with their non-disabled peers.

570.    As a direct and proximate cause of Defendants' violation of the ADA, Plaintiffs have suffered and continue to suffer grievous mental and emotional suffering, humiliation, stigma, loss of educational opportunities, and other monetary damages.

## COUNT II

### Violation of
### Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §§ 2000 *et seq*.

571.    Plaintiffs re-allege and incorporate by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

572.    Title VI of the Civil Rights Act of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. '2000d

573.    Defendants, as recipients of federal financial assistance, are bound by the requirements of Title VI and are prohibited from engaging in any form of discrimination based on race, color, or national origin in their programs and activities.

574.    Defendants have violated Title VI by subjecting Plaintiffs to discrimination based on their race, color, or national origin, which has resulted in the exclusion of Plaintiffs from participation in educational programs and activities and has denied them equal access to the benefits provided by Defendants' programs.

575.    Defendants have failed to take appropriate corrective actions to prevent or address this discrimination, despite being made aware of it by Plaintiffs.

576.    Defendants promise in their Handbook that "BCLA does not discriminate on the basis of race, color, [or] national origin" and acknowledges the requirements of Title VI.

577.    Despite these promises, and the requirements of Title VI, Defendants no comply or even feign compliance with Title VI.

578.    Defendants failed to provide Plaintiffs with information about their right to file a formal complaint with the Office of Civil Rights.

579.    Defendants failed to provide Plaintiffs with information about their right to file a formal grievance with BCLA.

580.    Defendants failed to provide or offer appropriate safety/interim measures to prevent racial harassment.

581.    Defendants failed to address the impact of harassment on Plaintiffs.

582.    Defendants failed to properly investigate and failed to provide training to its staff on how to conduct Title VI investigations.

583.    Because Defendants knew, or should have known, that Plaintiffs were being mistreated, harassed, and discriminated against on the basis of their race, national origin, or color, and failed to keep Plaintiffs safe from harm, and failed to provide them with an environment that was not hostile, these failures together and separately violated their rights under Title VI to participate in programs and activities at BCLA.

## **COUNT III**

### **Violation of the North Carolina State Constitution**

584.    Plaintiffs re-allege and incorporate by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

585.    The State Constitution provides that the people have the right to the privilege of education, and it is the State's duty to guard and maintain that right.  N.C. Const. art. I, § 15.

586.    Article I, Section 15 and Article IX, Section 2 of the State Constitution jointly guarantee each child "the right to a sound basic education.  An education that does not serve the purpose of preparing students to participate and compete in the society . . . is constitutionally inadequate." Leandro v. North Carolina, 346 N.C. 336, 345 (N.C. 1997).

587.    Plaintiffs were deprived of this right when Defendants failed to provide approved disability-related accommodations and services, to support disabled students with making adequate academic progress, to give students the knowledge and resources to succeed academically and in life (including a career), and to treat students the same regardless of disability, race, or other legally-protected classes.

588.　A school's deliberate indifference to student harassment also deprives students of their right to a sound basic education. Deminski ex rel. C.E.D. v. State Bd. of Educ., 377 N.C. 406, 413, 858 S.E.2d 788, 793-94 (N.C. 2021) (expanding the scope of Leandro by holding that a school's deliberate indifference to student harassment deprives those students of their right to a sound basic education guaranteed by the State Constitution).

589.　Article I, Section 19 of the State Constitution states that "No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State …."

590.　Such claims are not barred by the defense of sovereign or government immunity. Treating students differently based on legal classifications (e.g., race, disability, etc.) and tolerating racial discrimination deprives students of their right to a sound basic education.

591.　BCLA is a public charter school subject to the State Constitution.

592.　Like BCLA, Charter One is engaged in the exclusive and traditional state functions of providing public education and administering disability-related accommodations and services in compliance with public-school disability laws (e.g., Title II of the ADA and the Individuals with Disabilities Education Act).

593.　As stated above, Charter One is an EMO providing comprehensive, all-inclusive management services to BCLA.

594.　BCLA delegated to Charter One its public education functions, including public school discipline, which is governed by constitutional due process protections, and faculty hiring and training, which are different from private schools and must comport with BCLA's public school status.

595.    BCLA delegated its exceptional children's program that provides disability-related accommodations and services subject to public-school disability laws (which is exclusively a public education function).

596.    Upon information and belief, Charter One's revenue also comes almost entirely from state and local taxes.  At least one BCLA administrator is actually a Charter One employee, despite being held out to the public as BCLA administrators (e.g., Director Mognett, a Charter One employee, was the director of BCLA at all times relevant to this Complaint – In fact, many people thought Director Mognett was a BCLA employee).

597.    When issues arise at BCLA, Charter One employees (like Chris Elliott or Sarah Gamble) often respond.  The contacts for BCLA on various state websites are Charter One employees.  Charter One and BCLA are so pervasively entwined with each other and the State that they have an overlapping identity and cannot (and should not) be separated.

598.    Therefore, Charter One is a state actor and must be subject to the same legal requirements as BCLA, including the State Constitution.  Otherwise, Charter One can continue to act in ways that deprive students of a sound basic education and pose significant litigation risk to public charter schools like BCLA from which Charter One would otherwise be immune as a private actor.

599.    It is fundamentally unfair for Charter One to escape liability for its intentional wrongful actions that harm students.

600.    Even if this Court determines that Defendants are not fully state actors, though it should, this Court should determine that Defendants are state actors for the limited purpose of ensuring compliance with Title II of the ADA, to which Defendant BCLA is subject and which applies only to public institutions.

601.    When depriving Plaintiffs of their constitutional right to a sound basic education, Defendants were acting "'under color of [State] statute, ordinance, regulation, custom, or usage'..." Peltier v. Charter Day Sch., Inc., 37 F.4th 104 (4th Cir. 2022), cert. denied, 143 S.Ct. 2657 (2023).

602.    Plaintiffs were, at all times relevant, qualified students who were denied their rights to a sound basic education as a result of the Defendants' actions.  Defendants intentionally, willfully, wantonly, recklessly, or carelessly engaged in a pattern and/or practice of failing to comply with Title II of the ADA, including failures to: provide approved disability-related accommodations and services to Plaintiffs; engage in a meaningful interactive process with Plaintiffs; provide appropriate identification and evaluation for disabled Plaintiffs; facilitate appropriate participation between parents and teachers; provide proper procedural safeguards; and ensure equal access to BCLA's services, programs, and activities.  Plaintiffs were deprived of a sound basic education guaranteed by the State Constitution.  Moreover, Defendants violated the State Constitution by retaliating against Plaintiff Susan Hunter for asserting the right to a sound basic education on behalf of her minor children, E.R.H. and O.E.H.

603.    Plaintiffs were denied their right to a sound basic education as a result of Defendants' deliberate indifference to a hostile academic environment in which they were pervasively and severely harassed (often based on protected characteristics like race, sex, and/or disability).  In doing so, Defendants intentionally, willfully, wantonly, and recklessly discriminated against Plaintiffs.  Based on the facts stated above, which are incorporated by reference:

        a.    Defendants had substantial control over the harassing conduct and the educational environment in which it occurred and its effects were felt;

b. the harassing conduct was unwelcome and objectively and subjectively offensive;

c. the harassing conduct was severe and pervasive and, thus, discriminatory;

d. Defendants who had authority to take corrective action had actual knowledge of the harassing conduct; and,

e. Defendants exhibited deliberate indifference to the harassing conduct that resulted in damages to Plaintiffs.

604. By their (in)actions, Defendants further allowed a hostile environment to develop at BCLA in which harassment and discrimination were tolerated and/or did not meet with an appropriate response by Defendants. Such a hostile environment negatively impacted student learning and deprived students, including Plaintiffs, of a sound basic education.

605. Defendants' failures to provide certain due process protections in their disciplinary investigations (e.g., providing fairness, notice, an opportunity to be heard, interviewing witnesses without bias, objectively seeking truth irrespective of the outcome's reflection on Defendants' reputations; etc.) resulted in arbitrary and capricious outcomes that deprived Plaintiffs of their right to a sound basic education, as well as their constitutionally-protected property interest in their educations.

606. Defendants, acting under color of state law, denied Plaintiffs equal protection of the laws based on race and disability through disparate discipline.

607. The Plaintiffs were damaged as a result of the Defendants' violations, as indicated in this Complaint and to be further proven through discovery.

608. Defendants were, at all times relevant, state actors acting when they violated Plaintiffs' rights under the State Constitution and their claims are colorable.

609.    There are no other adequate state law remedies, so this action under the State Constitution is proper.

610.    Sovereign immunity and governmental immunity are not defenses to this cause of action.

## COUNT IV

### Gross Negligence or Negligence

611.    Plaintiffs re-allege and incorporate by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

612.    Defendant Charter One and its employees are acting as agents of Defendant BCLA.  Accordingly, Defendants are jointly and severally liable.  If agency is not found, each Defendant is still liable for its respective tortious conduct.

613.    The Defendants were and are vicariously liable for the acts of their employees acting within the scope of their employment, as was the case at all times relevant to the causes of action herein, through the Doctrine of Respondeat Superior.

614.    The Defendants owed to Plaintiffs the duties of care to:

  f.   ensure their employees maintained reasonable control and supervision over BCLA, including its employees and students, within the scope of their duties;

  g.   ensure their employees were competent, qualified, and properly trained to perform their duties;

  h.   maintain a safe and supportive educational environment where students had equal opportunity to make adequate academic progress and receive access to BCLA's programs and activities;

69

i.   be treated equally and fairly, without respect to their legally-protected classes of race and disability;

j.   comply with applicable laws and regulations concerning safety and civil rights, including, but not limited to, Title II of the ADA;

k.   respond promptly and equitably to reports and complaints of discrimination and harassment, so as to stop the discrimination and harassment, remedy its effects, and prevent its recurrence;

l.   act reasonably to address concerning information about which they know or reasonably should know to ensure students are safe and able to make adequate academic progress; and

m.   fulfill other duties of care that Defendants, as public-school operators and educators, owe to Plaintiffs.

615.   Defendant BCLA, by delegating its administration and responsibilities to Defendant Charter One, further had a duty to supervise Defendant Charter One and properly address reports and complaints concerning Charter One's services at BCLA.

616.   Defendants, through their employees and boards of directors, knew or reasonably should have known about concerning information that, if not properly acted on, would breach the above duties of care.

617.   It was reasonably foreseeable that the Defendants' breaches of the above duties of care, based on the information that Defendants knew or reasonably should have known, would cause damage to Plaintiffs.

618.   Defendants had the ability to fulfill their duties of care, and a reasonable person in Defendants' shoes who was exercising normal prudence and care would have done so.

619. Defendants were grossly negligent or, in the alternative, negligent by breaching their duties of care through their actions set forth in this Complaint, which are incorporated herein by reference.

620. Defendants' actions constituted willful and/or wanton conduct, making Defendants grossly negligent. In the alternative, if Defendants' conduct is found to not be willful and/or wanton (even though they were), the Defendants must be found to have acted negligently.

621. The Plaintiffs were damaged as a proximate result of the Defendants breaching their duties of care, as indicated in this Complaint and incorporated herein by reference.

622. If Defendants are found to be state actors, as they should be, Defendants have waived their sovereign immunity or governmental immunity.

## COUNT V

### Negligent Infliction of Emotion Distress (NIED)

623. Plaintiffs re-allege and incorporate by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

624. Defendants were negligent, as indicated above.

625. Plaintiffs suffered severe emotional distress.

626. Defendants' negligence was a proximate cause of Plaintiffs' severe emotional distress.

## COUNT VI

### Violation of the North Carolina Whistleblower Act
### N.C. GEN. STAT. § 126-84 *et seq.*

627. Plaintiff Susan Hunter re-alleges and incorporates by reference all allegations set forth in the foregoing paragraphs as though fully stated herein.

628. Plaintiff Susan Hunter, as a BCLA employees at all times relevant to her claim, was statutorily designated as a public-school employee. N.C. Gen. Stat. § 115C-218.90(4) states, "[I]t is the determination of the General Assembly that charter schools are public schools and that the employees of charter schools are public school employees."

629. Plaintiff Susan Hunter engaged in legally-protected activities when she reported BCLA to the NC DPI for disability discrimination.

630. Upon information and belief, Defendants took adverse actions against Plaintiff Susan Hunter in her employment at BCLA by placing her on a PIP and not renewing her contract.

631. To the extent the decision to not renew Plaintiff Susan Hunter's contract was made by BCLA's Board of Directors, Defendants unduly influenced BCLA's Board of Directors' decision and should be held liable applying a "Cat's Paw" theory of liability.

632. Upon information and belief, there is a causal connection between Plaintiff Susan Hunter's legally-protected activities and Defendants' adverse actions.

633. Upon information and belief, Defendants' stated reason for not renewing Plaintiff Susan Hunter's contract (i.e., complaints against her) was pretextual. The real reason was her complaints and reports of disability discrimination.

634. Plaintiff Susan Hunter was damaged as a result of the Defendants' violations, as indicated in this Complaint and incorporated herein by reference.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE**, based upon the foregoing, the Plaintiffs respectfully pray that:

A.  The Court declare Charter One to be a state actor;

B.  The Court find the Defendants liable to the Plaintiffs for their respective causes of action outlined above, or grant a jury trial on all issues so triable;

C.  Plaintiffs have and recover of the Defendants, jointly and severally, compensatory damages (with the amount recovered by each minor Plaintiff to be held in a trust for his or her benefit, including to fund continued therapy, outside tutoring, private school, and disability- and academic-related support until they reach adulthood);

D.  Plaintiffs have and recover of the Defendants, jointly and severally, punitive damages to punish their wrongful actions, as well as to deter future misconduct;

E.  Plaintiffs have and recover of the Defendants, jointly and severally, all other damages available under the laws and legal causes of action applicable to this Complaint;

F.  Plaintiffs have and recover of the Defendants, jointly and severally, post-judgment interest at the 8.00% per annum legal rate from the date of judgment;

G.  Plaintiffs have and recover of the Defendants, jointly and severally, reasonable attorneys' fees to the extent permitted by law;

H.  The costs of this action be taxed against the Defendants;

I.  The Court grant leave to amend to add additional plaintiffs and claims to promote justice; and,

J.  The Court grant any such additional and further relief as this Court deems proper and just.

Respectfully submitted,

**MCRARY LAW, PLLC**

Dated: December 20, 2024     By: /s/ Ian M. McRary
                                  Ian M. McRary
                                  State Bar No. 43507

Ian@mcrarylaw.com
231 Government Avenue S.W., #1094
Hickory, NC 28603
(828) 235-5551

**SMITH BUKOWSKI, LLC**

Jeffrey D. Bukowski, Esquire*[1]
PA Attorney I.D. No. 76102
JBukowski@SmithBukowski.com
Nathan L. Hopkins, Esquire*
PA Attorney I.D. No. 328162
NHopkins@SmithBukowski.com
1050 Spring Street, Suite 1
Wyomissing, PA 19610
(610) 685-1600

*Attorneys for Plaintiffs*

---

* Motion for Admission *Pro Hac Vice* to be promptly filed.