JENNIFER HAMILTON, ET AL.,

**Plaintiffs,**

v.

BONNIE CONE LEADERSHIP
ACADEMY, LLC AND
CHARTER ONE, LLC,

**Defendants.**

<u>**MEMORANDUM AND ORDER**</u>

**THIS MATTER** is before the Court on Defendants' Partial Motion to Dismiss (Doc. No. 24). The Court has carefully considered this motion and the parties' briefs and exhibits in support and in opposition. For the reasons discussed below, the Court will in part **GRANT** and in part **DENY** the motion. Specifically, the Court will 1) allow Plaintiffs' North Carolina state constitutional claim to proceed under the authority of *Peltier v. Charter Day School, Inc.*, 37 F.4th 104 (4th Cir. 2022); 2) deny the motion as to Plaintiffs' claims under North Carolina's Unfair and Deceptive Trade Practices Act because Defendants are in the business of providing charter school education and ancillary services, which is within the broad scope of N.C. Gen. Stat. § 75-1.1; and 3) grant the motion as to Plaintiffs' claims for breach of fiduciary duty and constructive fraud because no fiduciary relationship exists between Plaintiffs and Defendants.

## I. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp.*

1

*v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court, however, accepts all well-pled facts as true and draws all reasonable inferences in Plaintiff's favor. *See Conner v. Cleveland Cty., N. Carolina*, 22 F.4th 412, 416 (4th Cir. 2022); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

In so doing, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Pa. Nat'l Mut. Cas. Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Construing the facts in this manner, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) (quoting *Ashcroft*, 556 U.S. at 678). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

When deciding a motion to dismiss, "a court considers the pleadings and any materials 'attached or incorporated into the complaint.'" *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). The Court may also consider documents attached to a motion to dismiss when they are "integral and explicitly relied on in the Complaint," and where "plaintiffs do not challenge [the document's] authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606-7 (4th Cir. 2015).

## II.    FACTS AND PROCEDURAL HISTORY

Defendant Bonnie Cone Leadership Academy, L.L.C. ("BCLA") is a tuition-free, publicly-funded charter school that provides primary and secondary educational services in Mecklenburg County, North Carolina. Doc. No. 17 ("Am. Compl.") ¶¶ 40, 43. BCLA's sister school Bonnie Cone Classical Academy ("BCCA") organized BCLA and applies its State charter (the "Charter") to BCLA. *Id*. ¶¶ 44-45. Pursuant to the Charter, BCCA is responsible to the North Carolina Department of Public Instruction for "ensuring [BCLA's] compliance with applicable laws and the provisions of [BCCA's] charter[]." N.C. Gen. Stat. § 115C-218.15(a). *Id*. ¶ 45. Also, BCLA agreed to comply with all laws applicable to a public school, including the State Constitution. *Id*. ¶ 863. BCLA and BCCA share the same board of directors and are alleged to be so pervasively entwined with each other and the State that they have an overlapping identity and cannot be separated for legal purposes. *Id*. ¶ 859.

Defendant Charter One is a private, for-profit education management organization that provides education management services to approximately 50 public charter schools across the United States.  Ten of those public charter schools are located in North Carolina, including BCLA and BCCA. *Id*. ¶¶ 49-51. Plaintiffs allege that BCLA delegated to Charter One nearly every aspect of BCLA's operations, including curriculum, facilities, accounting, academics, disability services, marketing, enrollment management strategies, recruitment, human resources, information technology, and legal compliance as a public charter school. *Id*. ¶¶ 49-51, 75, 116, 858. Plaintiffs further allege that the BCLA board of directors is passive, "[s]erving as little more than Charter One's puppet that rubber-stamped what Charter One wanted to do." *Id*. ¶ 75. For example, BCLA Director Jennifer Mognett was a Charter One employee who was the director of BCLA during the 2023-2024 academic year, but did not indicate her Charter One employment on her business email

3

signature. *Id*. ¶¶ 158, 160. As additional evidence of the relationship with Charter One, Plaintiffs accuse BCLA and/or Charter One of contracting with companies owned by or affiliated with Charter One CEO Glenn Way's family's businesses to purchase school uniforms/apparel and other services. *Id*. ¶¶ 112-113.

Plaintiffs allege, upon information and belief, that Charter One received 15% of BCLA's revenue as its management fee, which gave it a financial incentive to maximize BCLA's revenue. *Id*. ¶¶ 76, 93-94. To boost revenue, Charter One allegedly recklessly drove up enrollment beyond what BCLA administrators and teachers could handle. *Id*. ¶ 76. Also, the Amended Complaint alleges that Charter One specifically targeted low-income (often racial minorities) and disabled students, for whom BCLA and Charter One received additional government funding under programs like Title I and the Individuals with Disabilities Education Act ("IDEA"). *Id*. ¶¶ 94, 98, 100, 105. Further, it is alleged that Charter One, through Mognett, directed BCLA employees to count students who were absent as present, or who Defendants knew were not enrolled, in order to receive government funding for those students. Indeed, Plaintiffs' allege that once students enrolled at BCLA, they could not simply withdraw to pursue other options. *Id*. ¶¶ 77, 149. According to Plaintiffs, to avoid losing revenue from enrolled students, Defendants intentionally made it difficult to withdraw from BCLA by "begging parents who requested to withdraw their children to not do so; by making false promises that things would improve; by implementing a 'continuous grading scale' whereby students who withdraw mid-year leave with an incomplete transcript and 'forced fail' (which requires them to lose any 'progress' and repeat those full courses elsewhere); and by causing significant undue delay in providing transcripts and other education records to the new school." *Id*. ¶ 149.

With respect to expenses, Plaintiffs allege that Charter One kept expenses artificially low to maximize profits through understaffing with unqualified, underqualified, and unlicensed teachers and administrators. *Id*. ¶ 79. Plaintiffs contend that the Exceptional Children ("EC") special education program was mostly neglected and, as a result, especially deficient. *Id*. ¶ 107. Defendants thus converted a significant amount of government funding (from Title I and IDEA) that was intended for low-income and disabled students to their own profit and/or improperly spent the funds on expenses that did not benefit either the EC program or such at-risk students. *Id*. ¶ 114.

In addition to receiving federal and state funding for students, BCLA received additional revenue from grants, bond issuance, fundraisers, and other sources. *Id*. ¶ 96. BCLA sold food and beverages to students in its cafeteria and charged fees for extracurriculars, including an Athletics Fee for participation on its cheer team. *Id*. ¶ 101. BCLA also operated athletics events, for which it sold tickets and concessions.

Plaintiffs are the parents or guardians of seventeen current or former students at BCLA. They allege that Defendants made false promises to induce their enrollment at BCLA, *Id*. ¶¶ 76, 117, and then in numerous and varied ways unlawfully discriminated and/or retaliated against them and failed to provide them with the education they had been promised and are constitutionally entitled. *Id*. ¶¶ 171-805. For example, Plaintiffs allege that Defendants (i) did not provide their students with proper services and accommodations in accordance with their individual education programs, as required by the IDEA; (ii) engaged in disability discrimination under the ADA based on the same conduct; and (iii) "tolerated" or showed "deliberate indifference" to harassment and bullying, some of which Plaintiffs claim was racially motivated.

Plaintiffs filed this action in December 2024. Doc. No. 1. An Amended Complaint was filed in March 2025, asserting claims for: (1) violations of the ADA and Section 504 of the Rehabilitation Act of 1973; (2) violations of Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §§ 2000 et seq.; (3) violations of the North Carolina State Constitution; (4) violations of the Fourteenth Amendment to the United States Constitution; (5) gross negligence or negligence; (6) negligent infliction of emotional distress; (7) violations of North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1 et seq.; (8) breach of contract (third party beneficiary claims); (9) breach of fiduciary duty and constructive fraud; (10) negligent misrepresentation; and (11) violations of the North Carolina Whistleblower Act. *See* Am. Compl. ¶¶ 806-933. Defendants moved to dismiss the state constitutional claim, UDTPA claim and claim for breach of fiduciary duty and constructive fraud in May 2025, Doc. No. 24, but in June 2025, the matter was stayed to permit arbitration of the claims of one of the original Plaintiffs, which recently concluded in a settlement. *See* Doc. Nos. 28, 33.  Accordingly, Defendants' Partial Motion to Dismiss, which is fully briefed, is now back before the Court and ripe for resolution so the case can move forward to discovery and consideration of the merits.

## III.    DISCUSSION

### A.    Count III – Claims Under the North Carolina State Constitution

Defendants first challenge is to Plaintiffs' claims that Defendants violated Article I, Section 15 and Article IX, Section 2 of the State Constitution, which together provide the "right to a sound basic education." *Leandro v. State*, 346 N.C. 336, 345 (1997); Am. Compl. ¶¶ 851-852. Defendants do not contend in their current motion that Plaintiffs fail to state a claim that they were denied a "sound basic education" at BCLA or dispute that BCLA and BCCA are public "state actors" who are obliged to protect constitutional rights. *See* Doc. No. 29 at 2.  Rather, they argue that Plaintiffs

are only entitled to an "opportunity" to obtain the educational rights guaranteed by the North Carolina State Constitution, which they could have received in a different public school. *Id*. at 1. Thus, according to Defendants, no matter how educationally deficient their public schools may be, they have no obligation to meet minimum constitutional standards because attendance at charter schools is voluntary and an appropriate education is available elsewhere. Beyond the absence of authority supporting this novel theory - or indeed much facial appeal as applied to a taxpayer funded public school - this argument is foreclosed by the Fourth Circuit's decision in *Peltier v. Charter Day School, Inc*., which is, of course, binding on this Court.

In *Peltier*, our Court of Appeals, sitting *en banc*, broadly held that North Carolina charter schools are "state actors" subject to the same constitutional obligations as other public schools. *Peltier*, 37 F.4th at 118-19. While the constitutional right directly at issue in *Peltier* was an equal protection challenge to the charter school's dress code under the Fourteenth Amendment, the court's ruling was broader, clearly encompassing obligations under North Carolina's Constitution. The Fourth Circuit wrote, "[t]he statutory framework of the North Carolina charter school system compels the conclusion that the state has delegated to charter school operators … part of the state's constitutional duty to provide free, universal elementary and secondary education." *Id*. at 118. Further, *Peltier* directly addressed – and rejected – Defendants' argument that the voluntary nature of charter school education and the availability of "traditional" public schools meant that charter schools were absolved from federal or state constitutional obligations. The Court explained:

> The response of both dissents apparently is that these students should just move on to a different public school that values constitutional rights more than "innovative" exclusionary measures. That is no answer. Rather, the plain and obvious answer to the problem is to ensure that operators of public charter schools in North Carolina are not insulated from the constitutional accountability borne by the state's other public schools. Courts may not subjugate the constitutional rights of these public-school children to the facade of school choice.

*Id*. at 122-23. Indeed, the court made sure it could not be misunderstood on this point, also holding: "*No* public school in North Carolina can violate the constitutional rights of its students. If a student wishes to attend a school with discriminatory policies, the student must select a private institution not subject to the constraints of the Constitution." *Id*. at 118 (emphasis in original).

Finally, there is no suggestion in *Peltier* that charter schools in North Carolina are subject to the federal but not the state constitution. To the contrary, as cited above and in the summary of its ruling quoted below, the court repeatedly referenced North Carolina's Constitution as part of its analysis:

> Ultimately, the state action inquiry in this case is not complicated: (1) North Carolina is required under its constitution to provide free, universal elementary and secondary schooling to the state's residents; (2) North Carolina has fulfilled this duty in part by creating and funding the public charter school system; and (3) North Carolina has exercised its sovereign prerogative to treat these state-created and state-funded schools as public institutions that perform the traditionally exclusive government function of operating the state's public schools….Under these circumstances, we will not permit North Carolina to delegate its educational responsibility to a charter school operator that is insulated from the constitutional accountability borne by other North Carolina public schools.

*Id*. at 122. Accordingly, under *Peltier*, all charter schools in North Carolina, including BCLA and BCCA, have the same obligations under the North Carolina Constitution as other public schools, and Plaintiffs may assert their state constitutional claims in Count III against the charter school Defendants.

Defendants' cramped reading of the Plaintiffs' rights and Defendants' obligations under *Leandro* is similarly unpersuasive. In *Leandro*, the North Carolina Supreme Court held that the state constitutional right to education has a "qualitative content, that is, … the state is required to provide children with an education that meets some minimum standard of quality." *Leandro*, 346 N.C. at 345. It defined that qualitative right as the "right to a sound basic education." *Id*. ("We…

conclude that the right to education provided in the state constitution is a right to a sound basic education. An education that does not serve the purpose of preparing students to participate and compete in the society in which they live and work is devoid of substance and is constitutionally inadequate."). In declaring this right, the *Leandro* court described it initially as simply "a right to a sound basic education" (as quoted above) and then further in the opinion as "an opportunity to receive a sound basic education in our public schools." *Id*. at 345, 347.

Defendants latch on to the addition of the word "opportunity" in the second formulation to significantly limit if not wholly eliminate the right with respect to public charter schools. Even ignoring the first description, which does not include "opportunity," the later inclusion of the word cannot bear the decisional weight Defendants ask the Court to give it. In effect, Defendants ask the Court to hold that in referring to educational "opportunity" in the context of broadly applying state constitutional obligations to all public schools, the *Leandro* court somehow inferentially held that public charter schools are, as a practical matter, fully exempt from the fundamental constitutional duty to provide the sound basic education which *Leandro* championed. The Court declines to read *Leandro* in that paradoxical manner, particularly given the expansive scope of *Peltier*, which broadly applied constitutional obligations to charter schools as public schools.

Fairly reading both descriptions of the state constitutional right to education together, "opportunity" in this context only means that students in each public school must be afforded the chance – an "opportunity" to learn rather than the certainty of completed learning – to get a constitutionally adequate "sound basic education." First, this is clear from the remainder of *Leandro*, which analyzes schools individually and holds that only a minimum education is mandated by the constitution; thus, schools in different counties can have a different quality of education without necessarily violating the constitution. *Id*. at 349-51. Second, in overruling the

North Carolina Court of Appeals, the North Carolina Supreme Court noted, "[t]he present case does not involve issues of equal access to available educational opportunities…." *Id.* at 254. So, the issue in *Leandro* was the application of a minimum constitutional standard across all public schools, not whether a student might obtain "access" to an education of undetermined quality at some public school. And, again, the mere possibility of attending a different public school is irrelevant. The issue is not what Plaintiffs could have done to avoid being in a constitutionally inadequate school, but whether the public school they attend is violating the constitution. Put another way, "you shouldn't have trusted us to educate your child" is not a winning 12(b)(6) defense.[1]

In sum, *Leandro* does not in any way suggest that a subset of state created public schools – taxpayer funded charter schools – do not have to provide the constitutionally required minimum level of a "sound basic education." The rule is not that some public schools have to satisfy the constitutional mandate, while others can slide by. Instead, *Leandro* applies its minimum educational standard to all public schools, and the Court will follow that decision here by denying Defendants' Motion to Dismiss Count III of the Amended Complaint.

### B. Count VII – UDTPA Claims

Defendants' second request to the Court is to dismiss Plaintiffs' Count VII claims under North Carolina's UDTPA. To state a UDTPA claim, Plaintiffs must plausibly allege that Defendants (1) committed an unfair or deceptive act or practice, that (2) was in or affecting commerce, which (3) proximately caused Plaintiffs' injury. *See Moore v. Unum Life Ins. Co. of*

---

[1] To be clear, the merits of Plaintiffs' state constitutional claims are not before the Court. Whether or not one or more of the Plaintiffs can establish that Defendants fell short of the minimum constitutional standard (not just that an individual student had a bad experience) will be determined through discovery and later proceedings.

*Am.*, No. 5:24-CV-00141-KDB-DCK, 2025 U.S. Dist. LEXIS 57722, at *15 (W.D.N.C. Mar. 27, 2025). As with their challenge to Count III, Defendants' argument against the UDTPA claims rest on a single point. Defendants argue that because "offering educational services free of charge, with no discretion to choose the students, has no economic impact," it is not "in or affecting commerce" within the meaning of the UDTPA. *See* Doc. No. 29 at 8. The Court disagrees with both Defendants' description of Plaintiffs' allegations and their UDTPA conclusion.

First, the Court cannot accept Defendants' contention that there is no "economic impact" from their alleged conduct. As Defendants' acknowledge, they are in the *business* of operating charter schools, including BCLA and BCCA. *See* Doc. No. 29 at 6 ("And to be sure, Defendants operate a business."). While there is no dispute that BCLA is a tuition-free, publicly funded charter school and no contract or monetary exchange between the parties for educational services (but may be for ancillary services such as food purchases, etc.), that does not mean that Plaintiffs are not consumers under the UDTPA or that the relationship does not affect the economic marketplace. In other words, just because individuals receiving a product or service don't pay directly for what they receive doesn't mean they aren't purchasers or that the transaction has no economic effect.

A familiar example will suffice. Often, the charges incurred by medical patients are paid by the government (Medicare or Medicaid) or private insurance, but it would be wrong (even foolish) to say the patients are not consumers of medical services or that there is no economic impact when a patient goes to the hospital, laboratory, or doctor.[2] The same logic applies here.

---

[2] With respect to UDTPA claims, the "learned profession" exception may apply to preclude various claims in the medical context, *see Mason v. Health Mgmt. Assocs.*, LLC, 421 F. Supp. 3d 237, 245 (W.D.N.C. 2019), but the points made here about who is a consumer and the economic impact of transactions where the cost is paid by a third party are unaffected by this exception.

Even though the state pays the tuition for public charter school students, it does so only for each individual pupil; so, charter schools have to recruit/attract parent and student customers – who are the consumers of their services – if they want to successfully run their businesses or, indeed, run a school at all. Plainly, it is the parent/student's choice to attend a charter school that makes it economically viable in the first place. And Plaintiffs have alleged that charter schools have a significant and profitable economic impact on the businesses that operate them and their employees, vendors, etc. Am. Compl. ¶ 68. Therefore, it is incorrect to say that Plaintiffs are not consumers of Defendants' charter school educational offerings or that the allegations of improper operational conduct at BCLA have no economic impact just because the students' tuition is paid by the state.

N.C. Gen. Stat. § 75–1.1(b) defines "commerce" as follows: "'Commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75–1.1(b). North Carolina courts have construed the term "commerce" broadly, encompassing more than mere business activity between sellers and buyers. *See White v. Thompson*, 364 N.C. 47, 56, 691 S.E.2d 676, 681-82 (2010) (As explained by this Court, "'[b]usiness activities' is a term which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or *whatever other activities the business regularly engages in and for which it is organized*.") (emphasis added). And, this Court has, at the 12(b)(6) stage, allowed UDTPA claims involving unfair or deceptive recruitment to educational institutions to proceed. *See Barchiesi v. Charlotte Sch. of L.*, LLC, No. 3:16-CV-00861, 2017 WL 3573823, at *8 (W.D.N.C. Aug. 17, 2017) ("Plaintiffs have set forth abundant allegations of Defendants' unfair and deceptive conduct

12

which denied Plaintiffs the ability to make an informed decision, and…all done by Defendants to induce attendance at [the school].")

Therefore, notwithstanding the payment of tuition by the state, the Court finds that Plaintiffs have adequate alleged conduct "in or affecting commerce" in North Carolina within the broad scope of the UDTPA and will deny Defendants' Motion to Dismiss Plaintiffs' Count VII.

### C. Count IX – Breach of Fiduciary Duty and Constructive Fraud

Finally, Defendants seek dismissal of Plaintiffs' Count IX claims for breach of fiduciary duty and constructive fraud. On these claims, the Court agrees with Defendants. For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707-08 (2001). Such a relationship has been broadly defined by the North Carolina Supreme Court as one in which "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence…" *Id*. (citing *Abbitt v. Gregory,* 201 N.C. 577, 598, (1931)); *see Dallaire v. Bank of Am., N.A*., 367 N.C. 363, 367 (2014) (citing *Dalton* for the same definition). Common to all these relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party. *Dallaire,* 367 N.C. at 367.

The elements of a constructive fraud claim largely overlap with the elements of a claim for breach of fiduciary duty. *See Chisum v. Campagna*, 376 N.C. 680, 706-07 (2021); *Action Learning Assocs., LLC v. Kenan-Flagler Bus. Sch. Exec. Educ. LLC*, No. 24CV003280-670, 2025 WL 1833162, at *12 (N.C. Super. July 2, 2025). "[A] cause of action for constructive fraud [requires] (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Planning Inc.*, 166 N.C. App. 283, 294 (2004). "The primary difference between pleading a claim

13

for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself" (which is not at issue here). *Id.*

Courts in North Carolina and elsewhere have been reluctant to expand the scope of recognized fiduciary relationships to an academic setting. *See Ryan v. Univ. of N. Carolina Hosps.*, 168 N.C. App. 729 (table), 2005 WL 465554 (2005) (declining to hold that the interactions between educators/supervisors and medical residents created a fiduciary relationship because the defendants had to serve other interests in addition to the students' interests); *McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 748 (M.D.N.C. 2016) ("North Carolina courts, like other jurisdictions, have generally declined to recognize a fiduciary relationship in the academic setting, such as between a university and its students."). Indeed, Plaintiffs acknowledge that they are "unaware of any North Carolina court finding a fiduciary relationship between a school and its students." *See* Doc. No. 26 at 16.

This Court similarly declines to expand the scope of fiduciary relationships into the competing set of relational interests that must be balanced in a public school. While citizens are of course encouraged to have "trust and confidence" in all government functions, including schools, those feelings are for most practical purposes aspirational rather than legal in character. That is, while a legal fiduciary must exalt the interests of its dependent over the interests of others, government actors must serve the numerous interests of all their constituents, including those interests that may be in conflict. In public schools, teachers and administrators not only must consider the different interests of multiple students and their parents but also institutional and other interests. As the court observed in *Ryan*, there are divided loyalties that exist in the academic setting, which "is unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another." 2005 WL 465554, at *4. Therefore, the relationship between parents,

students and their public schools is not a "fiduciary relationship" or legal "relationship of trust and confidence" sufficient to support Plaintiffs' Count IX claims for breach of fiduciary duty and constructive fraud. Defendants' Motion to Dismiss those claims will be granted.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Partial Motion to Dismiss (Doc. No. 24) is **GRANTED** in part and **DENIED** in part; specifically, the motion is **DENIED** as to Counts III and VII and **GRANTED** as to Count IX;

2. Defendants are directed to file an Answer to the Amended Complaint within 21 days of the date of this Order;

3. The Parties are directed to hold their initial attorney's conference and file the report of that conference within 14 days of Defendants' Answer; and

4. Thereafter, the Court will promptly enter a Case Management Order and the case shall proceed towards a resolution of the merits on the remaining claims in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 3, 2026

Kenneth D. Bell
United States District Judge